GARY Y. LEUNG (Cal. Bar No. 302928)
Email: leungg@sec.gov
DOUGLAS M. MILLER (Cal. Bar No. 240398)
Email: millerdou@sec.gov
YOLANDA OCHOA (Cal. Bar No. 267993)
Email: ochoay@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Alka N. Patel, Associate Regional Director
Amy J. Longo, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### Western Division

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. 2:18-cv-05008 |
| Plaintiff, | **SEC'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION, APPOINTMENT OF A RECEIVER, ASSET FREEZES, AND OTHER RELIEF** |
| vs. | |
| RALPH T. IANNELLI and ESSEX CAPITAL CORPORATION, | |
| Defendants. | Date:     July 16, 2018<br>Time:     10:00 a.m.<br>Ctrm:     N/A<br>Judge:    N/A |

# **TABLE OF CONTENTS**

I.      INTRODUCTION ............................................................................................. 1

II.     STATEMENT OF FACTS ............................................................................... 2

        A.     Essex's Equipment Leasing Business ................................................. 2

               1.     Iannelli and Essex's business model ....................................... 2

               2.     Essex's incoming cash was largely from financing activities, and not leasing operations ........................................................ 4

               3.     Essex was "running out of deficit" from 2014 to 2017 ........... 5

        B.     Defendants' Scheme to Avoid Defaulting on Essex's Obligations by Making $15 Million in Ponzi-Like Payments ................................. 6

        C.     Defendants' Material Misrepresentations and Omissions When Raising Investor Funds ...................................................................... 8

               1.     Defendants gave DIA false financial statements overstating Essex's assets by more than $20 million ................................. 8

               2.     Defendants lied to Granger about its basic investment ........... 10

               3.     Iannelli guaranteed debt that far exceeded his net worth ....... 12

        D.     Iannelli's Outsized Compensation v. Essex's Struggling Business ......... 12

        E.     Essex's Current Condition and Risk of Preferential Payments ............. 13

III.    ARGUMENT .................................................................................................. 14

        A.     The SEC Seeks a Preliminary Injunction in the Public Interest ............. 14

        B.     The SEC Has Made a *Prima Facie* Showing That Iannelli and Essex Committed Securities Fraud ................................................................ 15

               1.     To stay afloat, defendants resorted to Ponzi-like payments ........... 15

               2.     Defendants made material misrepresentations and omissions when raising investor funds ........................................................ 17

               3.     Essex's promissory notes are securities ................................. 18

               4.     Iannelli and Essex acted unreasonably and with scienter ........... 20

        C.     This Court Should Issue a Preliminary Injunction Because Defendants' Violations Are Likely To Continue ....................................... 22

        D.     This Court Should Grant the Additional Relief Sought by the SEC ........... 23

               1.     An asset freeze is warranted ................................................. 23

               2.     This Court should appoint a permanent receiver over Essex ........... 24

3. Accounting and preservation orders are needed ...............................25

IV. CONCLUSION...................................................................................................25

# TABLE OF AUTHORITIES

## CASES

*Aaron v. SEC*
   446 U.S. 680 (1980)..........................................................................20

*Basic Inc. v. Levinson*
   485 U.S. 224 (1988)..........................................................................17

*Burnett v. Rowzee*
   561 F. Supp. 2d 1120 (2008) ...........................................................16

*Donell v. Ghadrdan*
   2013 WL 692853 (C.D.Cal. Feb. 26, 2013) ....................................16

*FSLIC v. Sahni*
   868 F.2d 1096 (9th Cir. 1989) .........................................................14

*FTC v. Affordable Media, LLC*
   179 F.3d 1228 (9th Cir. 1999) .........................................................23

*Hollinger v. Titan Capital Corp.*
   914 F.2d 1564 (9th Cir. 1990) .........................................................20

*In re Parmalat Securities Litigation*
   684 F. Supp. 2d 453 (S.D.N.Y. 2010) ............................................21

*Johnson v. Couturier*
   572 F.3d 1067 (9th Cir. 2009) .........................................................23

*Mukamal v. General Electric Capital Corp. (In re Palm Beach Fin. Partners, L.P.)*
   517 B.R. 310 (Bankr. S.D. Fla. 2013) ............................................16

*Reebok Int'l, Ltd v. Marnatech Enterprises, Inc.*
   970 F.2d 552 (9th Cir. 1992) ...........................................................23

*Reves v. Ernst & Young*
   494 U.S. 56 (1990)...........................................................................20

*SEC v. Capital Consultants, LLC*
   397 F.3d 733 (9th Cir. 2005) ...........................................................24

*SEC v. Capital Cove Bancorp, LLC,*
   Case No. 8:15-cv-00980-JLS-JC, 2015 U.S. Dist. LEXIS 174962 (C. D. Cal. Sept. 1, 2015) .........................................................................15

*SEC v. Credit First Fund*
   2006 WL 4729240 (C.D. Cal. 2006) ...............................................24

*SEC v. Dain Rauscher, Inc.*
   254 F.3d 852 (9th Cir. 2001) ................................................15, 17, 20

iii

*SEC v. Fehn*
   97 F.3d 1276 (9th Cir. 1996) ..................................................................17, 22

*SEC v. Fifth Ave. Coach Lines, Inc.*
   289 F. Supp. 3 (S.D.N.Y. 1968) ...................................................................24

*SEC v. Franco*
   253 F. Supp. 2d 720 (S.D.N.Y. 2003) ..........................................................21

*SEC v. Headgear, Inc.*
   No. 3:14-CV-04294-RS, 2014 WL 6900938 (N.D. Cal. Dec. 8, 2014)...........15

*SEC v. Helms*
   2015 WL 5010298 (W.D. Tex. Aug. 21, 2015) .............................................16

*SEC v. Hickey*
   322 F.3d 1123 (9th Cir. 2003) .....................................................................23

*SEC v. Homestead Props., L.P.*
   No. SACV09-01331-CJC(MLGx), 2009 WL 5173685 (C.D. Cal. Dec.
   18, 2009) ...................................................................................................15

*SEC v. Hughes Capital* Corp.
   124 F.3d 449 (3d Cir.1997) .........................................................................20

*SEC v. Int'l Swiss Invs. Corp.*
   895 F.2d 1272 (9th Cir. 1990) ...............................................................23, 25

*SEC v. Management Dynamics, Inc.*
   515 F.2d 801 (2d Cir. 1975) ...................................................................14, 15

*SEC v. Manor Nursing Centers, Inc.*
   458 F.2d 1082 (2d Cir. 1972) .................................................................21, 23

*SEC v. Murphy*
   626 F.2d 633 (9th Cir. 1980) ..................................................................18, 22

*SEC v. Neman*
   2016 WL 6661174 (C.D. Cal. Jul. 15, 2016) ................................................16

*SEC v. Platforms Wireless Intern. Corp.*
   617 F.3d 1072 (9th Cir. 2010) .....................................................................17

*SEC v. R.G. Reynolds Enters., Inc.*
   952 F.2d 1125 (9th Cir. 1991) ................................................................19, 20

*SEC v. Schooler*
   902 F.Supp.2d 1341 (S.D. Cal. 2012) ..........................................................15

*SEC v. SG Ltd.*
   265 F.3d 42 (1st Cir. 2001).........................................................................19

*SEC v. Trabulse*
   526 F.Supp.2d 1008 (N.D. Cal. 2007)..........................................................15

*SEC v. Traffic Monsoon, LLC*

iv

245 F. Supp. 3d 1275 (D. Utah 2017) ...............................................16

*SEC v. Unifund SAL*
910 F.2d 1028 (2d Cir. 1990) ..........................................................23

*SEC v. Unique Financial Concepts, Inc.*
196 F.3d 1195 (11th Cir. 1999) .......................................................15

*SEC v. United Financial Group, Inc.*
474 F.2d 354 (9th Cir. 1973) .....................................................15, 22

*SEC v. W. J. Howey Co.*
328 U.S. 293 (1946)...................................................................18, 19

*SEC v. Wencke*
622 F.2d 1363 (1980) ........................................................23, 24, 25

*Simpson v. AOL Time Warner, Inc.*
452 F.3d 1040 (9th Cir. 2006) ........................................................16

*TSC Industries., Inc. v. Northway*, Inc.
426 U.S. 438 (1976)........................................................................17

*U.S. v. Nutri-Cology, Inc.*
982 F.2d 394 (9th Cir. 1992) ..........................................................14

*U.S. v. Odessa Union Warehouse Co-op*
833 F.2d 172 (9th Cir. 1987) .....................................................14, 22

*Vernazza v. SEC*
327 F.3d 851 (9th Cir. 2003) ..........................................................20

**FEDERAL STATUTES**

Section 80b-9
[15 U.S.C. § 80b-9]........................................................................14

**Securities Act of 1933**

Section 17(a)
[15 U.S.C. § 77q(a)] ...........................................................15, 16, 17

Section 17(a)(1)
[15 U.S.C. § 77q(a)(1)].......................................................15, 16, 20

Section 17(a)(2)
[15 U.S.C. § 77q(a)(2)]...................................................................20

Section 17(a)(3)
[15 U.S.C. § 77q(a)(3)].............................................................15, 16

Section 20(b)
[15 U.S.C. § 77t(b)].........................................................................14

**Securities Exchange Act of 1934**

Section 10(b)
    [15 U.S.C. § 78j(b)] ..................................................................15, 16, 17, 20

Section 21(d)
    [15 U.S.C. § 78u(d)] .......................................................................................14

# FEDERAL REGULATIONS

Rule 10b-5
    [17 C.F.R. § 240.10b-5]..................................................................................15, 16

Rule 10b-5(a)
    [17 C.F.R. § 240.10b-5(a)] ............................................................................15, 16

Rule 10b-5(c)
    [17 C.F.R. 240.10b-5(c)] ...............................................................................15, 16

## I.      <u>INTRODUCTION</u>

Ralph Iannelli runs Essex Capital Corporation ("Essex"), an equipment leasing business, out of a three-person office in Santa Barbara, California.  The company's purported business model is straightforward:  to finance the purchase of equipment, Essex borrowed from a bank and raised funds from promissory note investors.  It then leased that equipment out, and pocketed any margin between Essex's borrowing costs, on the one hand, and the incoming leasing revenue, on the other.  But Essex attracted promissory note investors with a high rate of return – generally 8.5% per annum – that thinned its margins.  And so, since as early as 2014, true operational revenues from Essex's leasing business have comprised only a small fraction of its incoming cash flows.  In practice, the majority of Essex's funds have instead come from its fund raising activities:  drumming up additional investment from promissory note holders, and obtaining commercial bank loans.  This strain on Essex's business model became especially acute whenever lessees in its lease portfolio defaulted.  In that case, Essex still had to repay principal and interest owed on the debt it incurred to buy the equipment leased by its defaulting lessee, but without the benefit of any leasing revenue from that equipment acquisition.  This came to pass on multiple occasions in 2014 to 2017, when three Essex lessees filed for bankruptcy.  At bottom, Essex has been running in the red for years, and that fact is not disputed.

By Iannelli's own admission, Essex was "running out of deficit" in not only 2015, but through 2016 and 2017 as well.  In all, Essex sustained a staggering $31 million in operating losses in 2014, 2015, and 2016 (its financials for 2017 have not yet been completed).  Yet in that same timeframe, defendants raised over $80 million from promissory note investors on the supposed strength and stability of Essex's equipment leasing business.  This SEC enforcement action arises from what Iannelli and Essex did to maintain the false veneer of Essex's financial success, and what they did to stay current on Essex's debt obligations in the face of a severe revenue shortfall.

Stated simply:

- Defendants raised funds from new investors in order to pay existing investors what they were owed.

- In the course of raising those new funds, defendants materially misrepresented Essex's financial condition, lied about the basic nature of the investments they were offering, and Iannelli personally guaranteed his investors' returns without having any coincident ability to honor that commitment.

That mirage of commercial viability accrued to Iannelli's direct benefit. From 2014 to 2016 – while Essex continued to raise funds from new investors, and in spite of the firm's dire financial straits – Iannelli paid himself more than $7 million in the form of discretionary bonuses and no-interest/no-maturity-date loans.

Because the evidentiary record establishes a *prima facie* case for violations of the federal securities laws, and because defendants are reasonably likely to repeat their violations, the SEC now moves for a preliminary injunction. As Essex's cash flow position became increasingly calamitous, Iannelli engaged in preferential investor treatment when refinancing or promising to repay the debt of certain investors to the detriment of others. Accordingly, the SEC respectfully requests, *inter alia*, that the Court appoint an equity receiver over Essex – to marshal and preserve existing assets, clarify the company's financial affairs, and ensure that defendants do not further misappropriate assets or engage in preferential investor treatment – and thus bring defendants' financial house of cards to an end.

## II.   STATEMENT OF FACTS

### A.   Essex's Equipment Leasing Business

#### 1.   Iannelli and Essex's business model

Iannelli is Essex's founder and sole shareholder. Declaration of Yolanda Ochoa ("Ochoa Decl."), Ex. 4 (Iannelli Inv. Test.) at 49:22-25. Aside from Iannelli, Essex has two other employees, an administrative person and an operational

2

1    employee who assists Iannelli with Essex's business.  *Id.* at 51:24-52:8.  All of

2    Essex's employees report to Iannelli, who oversees and personally conducts the

3    company's operations.  *Id.* at 51:3-6, 56:1-5.  Iannelli controlled Essex's corporate

4    bank and brokerage accounts and is their sole signatory.  *Id.* at 41:20-42:25;

5    Declaration of Rhoda Chang ("Chang Decl.") at ¶ 5(c).

6          Essex leases equipment to private equity and venture capital-backed startup

7    companies.  Ochoa Decl., Ex. 4 (Iannelli Inv. Test.) at 50:19-51:2.  To fund its

8    equipment purchases, Essex obtains financing through:  (i) loans from commercial

9    banks; and (ii) investor-financed promissory notes.  Ochoa Decl. at ¶ 12, Ex. 9 at

10   ECC045380 and 382; Ex. 4 (Iannelli Inv. Test) at 58:9-20, 98:15-99:9.  In general,

11   Essex owes interest on its promissory notes at rates of about 8% per year.  Ochoa

12   Decl., Exhs. 13-18, 4 (Iannelli Inv. Test) at 80:12-23; 103:108-105:5, 106:18-107:11,

13   110:20-111:8, 112:5-113:14, 126:13-128:12, 129:3-11.  On the commercial loan side,

14   Essex's bank lenders are secured by the leased capital equipment purchased with the

15   loan proceeds.  Ochoa Decl. at ¶ 12, Ex. 9 at ECC045382.  The vast majority of the

16   promissory notes Essex sold to investors, on the other hand, are not secured by any

17   equipment collateral.  *Id.*  Instead, promissory note investors relied upon a guarantee

18   backed by both Iannelli's and Essex's assets.   Ochoa Decl., Ex. 4 (Iannelli Inv. Test)

19   at 94:15-95:5, 108:15-18, 113:22-114:7.

20         The investor promissory notes issued since 2014 have maturity dates which

21   generally range from 1-3 years.  *See*, *e.g.*, Ochoa Decl., at ¶¶ 15-16, Exs. 12 and 13.

22   In practice, however, because most of Essex's promissory notes contain an automatic

23   rollover provision, many investors have opted to rollover their note, and continue

24   receiving the  interest promised by Essex, even after their note became due.  Ochoa

25   Decl., at ¶¶ 13-16, Exs. 10-13.  Essex currently owes about $28 million to promissory

26   note investors who, because their notes have already matured, are entitled to demand

27   repayment of their principal in the near term.  Chang Decl. at ¶ 26(e).

28         Essex then endeavored to lease the capital equipment financed by its bank

                                              3

loans and promissory notes to lessees – Essex's leasing portfolio focused on private-equity backed startup ventures – at a 10% rate of return.  Ochoa Decl., at ¶ 7, Ex. 4 (Iannelli Inv. Test) 50:19-51:2, 68:24-69:3, ¶ 12, Ex. 9 at ECC045380.  And thus, Essex purported to make profits on the difference between the interest rate it earned on equipment leases and the interest rate Essex paid to its investors and bank lenders. *Id.*.  Essex's business model assumed that once leased, the company's debt-financed equipment would actually generate the revenue stream contemplated by the lease.  In the event of a lessee's bankruptcy, however, that assumption is mistaken.

> ### 2.    Essex's incoming cash was largely from financing activities, and not leasing operations

At the end of 2014, one of Essex's lessees, Passaic Health Care, filed for bankruptcy.  Ochoa Decl., Ex. 4 (Iannelli Inv. Test.) at 69:23-70:3.  Passaic's bankruptcy was "particularly damaging" to Essex because it caused the Essex to lose $7.8 million in equipment leasing revenue (along with another $800,000 in legal fees incurred litigating with Passaic), while still being obligated to make payments on the debt Essex had incurred to acquire the equipment leased to Passaic.  *Id.* at 69:15-70:20, 83:25-84:5.  The revenue shortfall from Passaic's bankruptcy "put a lot of stress on the company."  *Id.* at 69:15-70:20.  Two other lessee bankruptcies in early 2017 had a similar adverse impact on Essex's financial condition, since in each case, Essex had to weather a substantial loss of leasing revenue without any concomitant reduction in the debt load that Essex took on when purchasing the equipment leased to its now-bankrupt lessees.  *Id.* at 69:15-20, 84:5-8, 143:18-20.

These bankruptcies only heightened an already entrenched aspect of Essex's business:  in truth, the majority of Essex's incoming funds were not being generated by its leasing operations, and instead originated from new promissory note investors and additional bank lending.  For example, from 2014 to 2016, about $107 million of Essex's incoming cash came from investors and banks.  Chang Decl. at ¶ 23.  In contrast, Essex only generated $34.4 million in equipment leasing revenue during that

same timeframe. *Id.* The truth about Essex's business – that its core work was simply raising new capital, rather than earning a return on that capital through equipment leasing – is also reflected in the company's cash outflows. From 2014 to 2016, Essex spent just $39.4 million to purchase new equipment, compared to $65 million spent to pay back Essex's investors and commercial lenders. *Id.*

### 3. Essex was "running out of deficit" from 2014 to 2017

The financial consequence of these lessee bankruptcies, and Essex's reliance on new fundraising to keep its operations going, is not disputed. In his sworn testimony before the SEC, Iannelli conceded that Essex was "running out of deficit" in 2015, 2016 and 2017. Ochoa Decl., Ex. 4 at 67:22-24, 69:8-10, 85:25-86:3, 235:23-25 ("We were ramped up to start to do business, and we had a number of bankruptcies, which hurt our business dramatically. I was like a one-armed paper hanger. Okay?"). More specifically, Essex's restated financial statements for 2014 reported a net operating loss of $2.14 million. Chang Decl. at ¶ 15, Ex. 2. Its restated financial statements for 2015 reported a net operating loss of $7.04 million. Chang Decl. at ¶ 17, Ex. 4. According to its just-completed financials, Essex's operating losses ballooned in 2016 to $22.8 million. Chang Decl. at ¶¶ 19-20, Ex. 6. And while Essex has not finished its financial statements for 2017, its bank records demonstrate that the company's 2017 cash outlays exceeded its 2017 cash inflows, a fact that Iannelli readily admitted when questioned under oath in November 2017. Ochoa Decl., Ex.4 at 67:22-24 ("Q. Is Essex Capital currently running out of deficit? A. More money is going out than is coming in."). In spring 2017, Essex restated its 2014 and 2015 financial statements; each set of restated financials added a "going concern" note providing that there is "substantial doubt about the Company's ability to continue as a going concern." Chang Decl. at ¶¶ 15-18, Ex. 2 and 4. Essex's just-finalized 2016 financial statements contain the same note. Chang Decl. at ¶¶ 19-20, Ex. 6. In short, Essex has been hemorrhaging cash for years, and Iannelli was candid on what he claims to be the root cause of that deficit:

1
2

> [W]e have a very good business model, as long as people don't go
> bankrupt.  And I don't mean to be flip about that, but – but – I mean,
> it works.  We've just been burdened by three bankruptcies.

3   Ochoa Decl., Ex. 4 at 68:25-69:4.

4          Yet when marketing promissory notes to investors in an effort to fill the

5   breach, Iannelli withheld the truth.  *Id.* at 71:11-20  ("I didn't think that it was

6   necessary to tell them because I thought this was a temporary problem").  As

7   demonstrated above, Essex's "problems" were by no means "temporary."  Its

8   operating losses began no later than 2014 and have continued to this day.  And so in

9   order to stay "current" on its debt and conceal the fact that Essex's "very good

10  business model" was in fact floundering, defendants resorted to a pattern and practice

11  of Ponzi-like payments, as well as material misrepresentations and omissions to

12  Essex's promissory note investors.

13  **B.     Defendants' Scheme to Avoid Defaulting on Essex's Obligations by**

14  **Making $15 Million in Ponzi-Like Payments**

15         Essex is marketed as an equipment leasing company, but its main source of

16  cash isn't leasing income from operations, but rather funds either borrowed from

17  banks or raised through the sale of promissory notes to investors.  From 2014 through

18  2016, leasing income comprised no more than a quarter of the company's cash

19  inflows.  Money from investors and banks, by contrast, made up on average about

20  70% of the company's cash inflows.  Chang Decl. at ¶ 22.  Not surprisingly then,

21  since at least 2014, Essex's lease income has been insufficient to cover the principal

22  and interest Essex owed to its promissory note investors.  In 2017, for instance, Essex

23  operated at an average monthly deficit of nearly $1 million.  Chang Decl. at ¶ 21.

24  That persistent deficit in operational revenue has forced the company, on dozens of

25  occasions, to use incoming investor funds to pay existing investors their principal and

26  interest.  That Essex was borrowing from Peter to pay Paul in order to stay afloat

27  (also called a Ponzi scheme) is borne out by a forensic accounting analysis of the

28  day-to-day impact of each and every credit and debit transaction effected in Essex's

1  corporate bank accounts from January 1, 2014 to March 30, 2018.

2      In all, a forensic analysis shows that from 2014 through March 2018, Essex

3  made 89 different payments to investors using funds it had received from other Essex

4  investors.  Chang Decl. at ¶¶ 6-14, Ex. 1.  Over the course of four years, Essex

5  transferred an aggregate of no less than $15.6 million in funds from some investors to

6  pay returns and repay principal to other investors.  *Id.* at ¶ 14, Ex. 1.  As just one

7  example, an October 2015 influx of millions of dollars from investors places

8  defendants' scheme in stark relief.

9      On October 20, 2015, Essex had only $772,463.99 in available funds, and of

10  that amount, $539,220.45 represented funds raised from Essex investors.  Chang

11  Decl. at ¶ 14.  Stated differently, Essex was holding only $233,243.54 in cash that it

12  had generated from its operational activities.  *Id.*  But from October 21 to October 23,

13  Essex had to make $1,103,225.51 in interest and principal payments to its existing

14  investors, and it did not have enough money from operations ($233,243.54) to meet

15  its obligations to existing investors.  *Id.*  Essex, however, had just solicited $4 million

16  in new investment from the clients of a registered investment adviser, Granger

17  Management, LLC ("Granger"), funds that arrived in the nick of time on October 21.

18  *Id.*  With that new money in hand, Essex then effectuated a series of Ponzi-like

19  payments.  After receiving Granger's money on October 21, Essex immediately

20  repurposed those funds to pay returns to its existing investors on October 21, 22 and

21  23.  *Id.*  That was fraudulent, particularly since, as explained below, Essex had

22  represented to Granger that its clients' investment would be used to finance the

23  acquisition of equipment leases that Granger would own.

24      Essex teetered on this financial high-wire for years.  And while it did remain

25  "current" on its debt, Essex resorted to fraud to do it.  Essex never disclosed to

26  promissory note investors that its equipment leasing operations were not the primary

27  source of their returns.  Thus, despite Essex sustaining multi-million dollar operating

28  losses each and every year, nothing appeared amiss to incoming investors and those

1   existing note holders who chose to roll over their mature debt.  These Ponzi-like

2   payments were only one component of defendants' fraud.

3       **C.    Defendants' Material Misrepresentations and Omissions When**

4           **Raising Investor Funds**

5       Since 2014, Essex raised more than $80 million from about 70 promissory note

6   investors.  Chang Decl. at ¶ 24.  About half of these investors are Iannelli's friends,

7   business associates, or their referrals.  Ochoa Decl., ¶ 7, Ex. 4 (Iannelli Inv. Test)

8   100:1-20; ¶ 15, Ex. 12.  The bulk of the remaining promissory note investors are

9   clients of two registered investment advisers that were solicited by Essex for

10  investment:  Daniel Investment Associates, LLC ("DIA") and Granger.  Ochoa Decl.,

11  ¶¶ 13 and 17, Exs. 10 and 14; ¶ 7, Ex. 4 (Iannelli Inv. Test) 98:15-99:9.  Essex has

12  sold $8.4 million in promissory notes to 21 DIA clients since 2014.  *Id.* at ¶ 13, Ex.

13  10.  For their part, Granger clients – through a pooled investment fund – have

14  invested $23.36 million in Essex promissory notes since 2015.  Essex's increased

15  fundraising from registered investment advisers, in contrast to its historical investor

16  base of Iannelli's friends and business associates, were part of Iannelli's goal of

17  "institutionalizing the business and becoming less reliant on non-institutional

18  lenders."  *Id.*, Ex. 4 (Iannelli Inv. Test.) at 144:14-145:7.  As those institutional

19  investments came in the door from DIA and Granger, Iannelli took more from the till

20  and his compensation markedly increased.  Chang Decl. at ¶ 30.  However, the more

21  than $30 million Essex raised from DIA's and Granger's advisory clients was

22  procured by fraud.

23       **1.    Defendants gave DIA false financial statements overstating**

24           **Essex's assets by more than $20 million**

25       In May 2017, after receiving a subpoena from the SEC, the company restated

26  its 2014 and 2015 financial statements.  Chang Decl. at ¶¶ 15, 17, Exs. 2 and 4.  For

27  2014, total assets reported had been inflated by $23.3 million, and in 2015, Essex's

28  total assets reported had been inflated by $53.4 million.  Chang Decl. at Exs. 2-5.

1   This gross overstatement of Essex's assets happened because of Iannelli.

2        In January 2014, Iannelli provided the outside accountant preparing Essex's

3   financial statements with an incorrect SEC filing showing that Essex held 1.5 million

4   shares of a company called Revance.  Iannelli soon knew, however, that Essex's

5   holdings were actually in the range of 145,000 shares.  He subsequently received

6   corrective documentation from Revance and its transfer agent on January 22,

7   February 12, and March 19, 2014, all of which made it clear that Essex's true stake in

8   Revance was nowhere near the 1.5 million shares that Essex's accountant had been

9   led to believe.  Ochoa Decl. at ¶¶ 19-21, Exs. 16-18 (Inv. Test. Exs. 111, 112 and

10  113); Ex. 4 (Iannelli Inv. Test.) at 157:11-158:22, 163:2-170:12; Ex. 5 (Harris Inv.

11  Test.) at 63:3-23, 64:9-65:2, 173:23-174:23.  Despite knowing no later than March

12  2014 that he had provided Essex's accountant with a wildly incorrect Revance share

13  count, Iannelli allowed the accountant to prepare Essex's 2014 and 2015 financials on

14  the basis of that wrong information.  The total assets reported in Essex's 2014 and

15  2015 financials were false – off by a delta of $23.3 million and $53.4 million,

16  respectively – and they remained uncorrected until 2017, when Essex restated its

17  financials upon learning that the SEC was investigating.  Ochoa Decl., Ex. 4 (Iannelli

18  Inv. Test.) at 209:3-12 (Iannelli flagged issue for Essex's accountant only after

19  receiving SEC subpoena in 2017).

20       Two years earlier, however, Essex defrauded DIA's advisory clients when it

21  provided those false 2014 and 2015 financials to DIA in the course of soliciting their

22  investment.  In spring 2015, Iannelli sought to raise additional funds from DIA

23  clients, and as part of that effort, Essex provided DIA with the company's false

24  financial statements for 2014 on March 9, 2015, and the company's false financial

25  statements for 2015 in early 2016.  Ochoa Decl., Ex. 6 (Van Wyk Inv. Test.) at 18:11-

26  17; Ex. 4 (Iannelli Inv. Test.) at 176:13-19.  After receiving Essex's false financial

27  statements, DIA clients invested over $6.9 million in Essex promissory notes from

28  March 2015 through March 2017.  Ochoa Decl. at ¶ 13, Ex. 10.

DIA's investment manager reviewed and relied on those false financials when recommending Essex's promissory notes to his clients for investment. Ochoa Decl., Ex. 6 (Van Wyk Inv. Test.) at 18:18-22, 184:1-186:10. The overstatement of Essex's assets in the 2014 and 2015 financial statements defendants provided to DIA would have been material to its investment recommendation, and had DIA known of the errors, they would have at a minimum engaged in a greater level of due diligence on Essex's true liquidity and cash flow position. *Id.* at 48:14-50:8, 187:13-189:19. What's more, the inclusion of a going concern note to Essex's 2014 and 2015 financials would have likewise impacted DIA's investment recommendation. *Id.* at 53:6-54:6. Iannelli admitted that he knew Essex's asset values were inflated, but claimed to not know to what degree. *Id.*, Ex. 4 at 155:17-25; *see also* 232:21-233:10. But as DIA's investment manager put it, "$30 million is a lot of money. I think that even if you're remotely aware that something was off, that's not something you're going to miss." *Id.*, Ex. 6 (Van Wyk Inv. Test.) at 58:20-24; *see also* Ex. 5 (Harris Inv. Test.) at 116:10-19. Once it discovered that Essex was restating its financials, DIA stopped investing its clients in Essex. *Id.*, Ex. 6 (Van Wyk Inv. Test.) at 45:22-24.

## 2. Defendants lied to Granger about its basic investment

From 2015 to 2016, defendants raised an additional $23 million in investments from Granger advisory clients. Chang Decl. at ¶ 25. Rather than purchasing individual promissory notes from Essex, those clients pooled their money in a Granger client fund, which then invested $10 million (in 2015) and $13.36 million (in 2016) with Essex. *Id.* In exchange for that $23.36 million, the Granger client fund received a 50% stake in two LLC vehicles co-owned with Essex. Essex represented that it would use that $23.36 million in investor money to: (i) buy equipment and secure lease agreements for that equipment; (ii) assign those leases to the two LLC vehicles; and (iii) split the revenue generated by those leases (lease payments, end-of-lease residual payments, and warrants from lessees) between the two members of the

1   LLC vehicles, the Granger client fund and Essex.  Ochoa Decl., Ex.at ¶ 11, Ex. 7

2   (Present Inv. Test) at 14:16.-18:20, 64:7-24, 68:11-69:9; 84:1-15, 124:16-125:20, ¶¶

3   22-23, Exs. 19-20.

4          Essex never assigned a single lease to either of the LLC vehicles.  Ochoa Decl.,

5   Ex. 4 (Iannelli Inv. Test.) at 256:2-6, 271:13-273:3, 275:1-276:13; Ex. 8 (Present Inv.

6   Test.) at 87:10-90:8; ¶ 24, Ex. 21 (Inv. Ex. 60).  Instead, defendants provided Granger

7   with multiple lease assignments, executed by Iannelli, which referenced schedules

8   purportedly listing the leases to be assigned.  *Id.*  Those schedules, however, were all

9   missing or if provided, left blank.  *Id.*  In his testimony before the SEC, Iannelli

10  admitted that Essex was unable to assign any leases to the LLC vehicles.  *Id.*, Ex. 4

11  (Iannelli Inv. Test.) at 256:2-6, 266:16-267:1.  Defendants accordingly lied to

12  Granger about a fundamental feature of Granger's supposed investment.

13         The agreed-upon investment structure – formation of a jointly-owned LLC

14  which actually held the revenue-generating leases – was "very material" to Granger's

15  investment.  *Id.*, Ex. 7 (McManus Inv. Test.) at 48:2-6, 73:22-74:4, 91:7-92:19 ("we

16  wanted to own them … with our name on them and for just greater security"); Ex. 8

17  (Present Inv. Test.) at 15:12-16:1, 17:3-16.  Had Granger known that leases were not

18  going to be assigned to the LLC vehicle, it never would have invested its clients in

19  Essex.  *Id.*, Ex. 7 (McManus Inv. Test.) at 91:15-20; Ex. 8 (Present Inv. Test.) at

20  18:11-20 ("We would not have engaged in this transaction unless Mr. Iannelli

21  expressly agreed that the leases would be owned by [Granger]"), 90:9-91:22.

22         Iannelli further represented to Granger that he would personally match the

23  Granger client fund's investments "one-to-one," a commitment that Iannelli later

24  confirmed at Granger's request.  *Id.*, at ¶ 26, Ex. 22 (Inv. Ex. 119), Ex. 4, (Iannelli

25  Inv. Test) at 277:7-279:21 ("As always we are 50/50 on each transaction.").  This

26  representation mattered and was significant to Granger's decision to invest:  having

27  promised to put Essex's money alongside Granger's investment, defendants led

28  Granger to believe that Iannelli was aligning his interests with Granger's clients by

sharing the risk of investment with them. *Id.*, Ex. 7 (McManus Inv. Test.) at 79:10-20. This too was false. Iannelli and Essex did not match a single dollar of Granger's $23.36 million investment. *Id.*, Ex. 4 (Iannelli Inv. Test.) at 276:14-277:1, 280:2-280:21. Iannelli admitted that he hadn't because he and Essex lacked the funds to do so. *Id.*, Ex. 4 at 279:3-281:4.

### 3.   Iannelli guaranteed debt that far exceeded his net worth

Since 2015, Essex has issued about $60 million in promissory notes that Iannelli personally guaranteed. *Id.*l., Ex. 4 (Ianelli Inv. Test.) at 104:4-8, 108:15-18, 112:22-113:1, 113:24-114:4, 125:24-126:6. Iannelli's personal guarantees far exceeded his net worth. *Id.* at 320:18-321:2, 323:24-324:2. Iannelli knew that. *Id.* at 324:20-25. He didn't tell note investors that since "no one asked me." *Id.* at 325:2-7. Still, Iannelli personally guaranteed investors' promissory notes because "they felt better knowing that I was personally guaranteeing the note." *Id.* at 325:9-13. Iannelli's personal guarantee and net worth were factors that DIA considered when deciding to recommend an investment in Essex to its clients. DIA would not have recommended investment in Essex if it had determined Essex and Iannelli "wouldn't be able to stand behind the personal guarantee and the terms of the notes." *Id.*, Ex. 6 (Van Wyk Inv. Test.) at 50:10-19.

### D.   Iannelli's Outsized Compensation v. Essex's Struggling Business

From 2014 to 2016, Essex sustained a total operating loss of more than $31 million. In that same time period, however, Iannelli paid himself $7.2 million in the form of discretionary bonuses and fund transfers that were booked as "loans." Chang Decl. at ¶¶ 27-30. During the SEC's investigation, Essex failed to produce any written loan agreements between Essex and Iannelli, which would set forth whether any interest is due and the maturity dates for those loans, and so those "loans" appear to be interest-free and payable only when Iannelli decides, in his own judgment, that he must pay back Essex. *See* Chang Decl. at ¶ 29. Indeed, it was Iannelli's practice to borrow and pay back large lump sums from Essex through the course of the year,

1  and then at the end of the year, forgive portions of that loan and record that loan

2  forgiveness as his discretionary compensation.  *Id.*

3  **E.      Essex's Current Condition and Risk of Preferential Payments**

4  Essex stopped offering its promissory notes after the SEC commenced its

5  investigation in 2017.  The company's bank lender will not extend any additional

6  loans to Essex until there is a resolution of the SEC matter.  Ochoa Decl., Ex. 4

7  (Iannelli Inv. Test.) at 137:17-19.  At present, Essex generates about $1.34 million in

8  lease income each month.  Sixty-one percent of that income, however, is being eaten

9  up by payments on Essex's bank loans, leaving only about $510,000 each month to

10  fund Essex's ongoing operations and service its remaining debt to promissory note

11  investors.  But in 2017, Essex had to pay, on average, $1.4 million in monthly interest

12  and principal repayment to its note holders.  *Id.*, Exs. 10-11 (Essex noteholder

13  schedules).  Taking into account another $200,000 in monthly operational expenses,

14  Essex has been hemorrhaging in excess of $1 million in cash a month through 2017.

15  Chang Decl. at ¶ 21.  And compounding matters, the total amount of noteholder debt

16  that has matured, which Essex would have to repay in the near term if investors

17  sought redemption, is about $28 million.  *Id.* at ¶ 26(e).  This situation is untenable.

18  Essex does have several million in existing assets.  As of March 2018, the

19  company held about $11.7 million in marketable securities in its brokerage accounts.

20  Those assets, however, are encumbered by a $5 million margin loan that Essex took

21  out last year.  That margin loan, as well as Essex's liquidation of about $4 million in

22  securities in its brokerage account, was needed in 2017 to raise enough cash to stay

23  current on Essex's note.  Chang Decl., ¶ 26, Exs. 8 and 14.  Essex's remaining assets

24  are at risk of liquidation and transfer in a way that inequitably prioritizes some

25  investors over others.

26  Iannelli has already opted to fully redeem certain promissory note investors,

27  even though their debt had not yet matured and Essex was under no legal obligation

28  to do so.  Ochoa Decl., Ex. 4 (Iannelli Inv. Test.) at 74:20-76:7, 79:14-24.  As another

example, Essex has restructured its debt with one promissory noteholder by transferring securities with a market value of $900,000 to the noteholder, in exchange for a deferred payment plan. *Id.*, ¶ 6 Ex. 3 (7/27/17 cover letter). Similarly, Essex at one point promised Granger this spring that, by liquidating its marketable and illiquid securities holdings, Essex will soon become current on its obligations (Essex is behind on its interest payments to Granger). *Id.* ¶ 26, Ex. 21. If not halted, there is a serious probability that these kinds of efforts – the equivalent of rearranging the deck chairs on the Titanic – will result in preferential treatment for some of Essex's investors, at the expense of other investors.

## III.   ARGUMENT

### A.   The SEC Seeks a Preliminary Injunction in the Public Interest

Section 20(b) of the Securities Act and Section 21(d) of the Exchange Act authorize the SEC to obtain a preliminary injunction, without a bond. *See* 15 U.S.C. §§ 77t(b), 78u(d) & 80b-9. In the Ninth Circuit, preliminary injunctive relief may be ordered if there is "either (1) a combination of probable success on the merits and the possibility of irreparable injury or (2) that serious questions are raised and the balance of hardships tips in the applicant's favor." *U.S. v. Nutri-Cology*, *Inc.*, 982 F.2d 394, 397 (9th Cir. 1992). The SEC, however, appears before the Court "not as an ordinary litigant, but as a statutory guardian charged with safeguarding the public interest in enforcing the securities laws." *SEC v. Management Dynamics*, *Inc.*, 515 F.2d 801, 808 (2d Cir. 1975). Because this enforcement action is brought in the public interest, the Court's "equitable powers assume an even broader and more flexible character than when only a private controversy is at stake." *FSLIC v. Sahni*, 868 F.2d 1096, 1097 (9th Cir. 1989); *see also U.S. v. Odessa Union Warehouse Co-op*, 833 F.2d 172, 174-75 (9th Cir. 1987). District courts in the Ninth Circuit have interpreted the preliminary injunctive relief standard in SEC emergency actions to require only a two-prong showing:  (1) a prima facie case that the defendants have violated the federal securities laws, and (2) a reasonable likelihood that the defendants will repeat

their violations.[1]  The SEC has made this showing here.

**B.      The SEC Has Made a _Prima Facie_ Showing That Iannelli and Essex Committed Securities Fraud**

Iannelli and Essex engaged in a fraud in violation of the antifraud provisions of Section 17(a) of the Securities Act, and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.  Section 17(a) prohibits fraud in the offer or sale of securities, and Section 10(b) and Rule 10b-5 prohibit fraud in connection with the purchase or sale of any security.  See 15 U.S.C. § 77q(a); 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5; _SEC v. Dain Rauscher_, _Inc_., 254 F.3d 852, 855 (9th Cir. 2001).  Defendants violated both antifraud provisions.

**1.      To stay afloat, defendants resorted to Ponzi-like payments**

Essex has sustained severe operating losses over the last four years, losses that were spurred in part by a spate of lessee bankruptcies.  With bank payments consuming upwards of 61% of its leasing income, Essex was only able to stay current on its obligations to promissory note investors by paying those investors with funds received from other investors.  In all, Essex has made $15.6 million in Ponzi-like payments since 2014.  That is a textbook scheme to defraud, one that violated Sections 17(a)(1) and (a)(3) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) thereunder.

Sections 17(a)(1) of the Securities Act prohibits any person, "in the offer or sale of any securities," from employing "any device, scheme, or artifice to defraud,"

---

[1] _See, e.g._, _SEC v. Schooler_, 902 F.Supp.2d 1341, 1345 (S.D. Cal. 2012); _SEC v. Capital Cove Bancorp, LLC_, Case No. 8:15-cv-00980-JLS-JC, 2015 U.S. Dist. LEXIS 174962, at *16-17 (C. D. Cal. Sept. 1, 2015); _SEC v. Headgear, Inc._, No. 3:14-CV-04294-RS, 2014 WL 6900938, at *1 (N.D. Cal. Dec. 8, 2014); _SEC v. Homestead Props., L.P._, No. SACV09-01331-CJC(MLGx), 2009 WL 5173685, at *2 (C.D. Cal. Dec. 18, 2009); _SEC v. Trabulse_, 526 F.Supp.2d 1008, 1012 (N.D. Cal. 2007); _see also SEC v. United Financial Group, Inc._, 474 F.2d 354, 358 (9th Cir. 1973); _SEC v. Unique Financial Concepts, Inc._, 196 F.3d 1195, 1199 n.2 (11th Cir. 1999); _Management Dynamics_, 515 F.2d at 808.

15 U.S.C. § 77q(a)(1), or from engaging in "any transaction, practice, or course of business which operates, or would operate, as a fraud or deceit upon the purchaser," 15 U.S.C. § 77q(a)(3).  Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder make it unlawful for any person, "in connection with the purchase or sale of any security," "[t]o employ any device, scheme or artifice to defraud," or "[t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."  15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5(a), (c). To be liable for a scheme to defraud, a defendant "must have engaged in conduct that had the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme."  *Simpson v. AOL Time Warner*, *Inc*., 452 F.3d 1040, 1048 (9th Cir. 2006).

A Ponzi scheme is a scheme to defraud under the antifraud provisions.  *See SEC v. Neman*, 2016 WL 6661174, *5 (C.D. Cal. Jul. 15, 2016); *Burnett v. Rowzee*, 561 F. Supp. 2d 1120, 1127-28 (payments of sham returns are deceptive acts that "allows the scheme's principals to continue to draw investments from other sources by creating the appearance of a viable investment opportunity"); *SEC v. Traffic Monsoon*, *LLC*, 245 F. Supp. 3d 1275, 1299 (D. Utah 2017); *Mukamal v. General Electric Capital Corp. (In re Palm Beach Fin. Partners, L.P.)*, 517 B.R. 310, 346 (Bankr. S.D. Fla. 2013) (in a Ponzi scheme, "the entity gives the false appearance of profitability by seeking investments from new sources rather than earning profits from assets already invested."); *SEC v. Helms*, 2015 WL 5010298, at *13–*14 (W.D. Tex. Aug. 21, 2015) (concluding that a Ponzi scheme was a "scheme to defraud" under Rule 10b–5 and Section 17(a)); *see also Donell v. Ghadrdan*, 2013 WL 692853 at *1 (C.D.Cal. Feb. 26, 2013) (a Ponzi scheme is "any sort of fraudulent arrangement that uses later acquired funds or products to pay off previous investors").

Here, defendants engaged in a scheme to defraud investors by making $15 million in Ponzi-styled principal and interest payments from 2014 through 2017. Those payments were passed off as returns derived from Essex's equipment leasing

business when they were in fact payments made using other investors' capital.  By engaging, over a protracted period of four years, in scores of Ponzi-like payments in a failed effort to bail water out of Essex's sinking financial ship, defendants violated the antifraud provisions of the federal securities laws.

## 2.     Defendants made material misrepresentations and omissions when raising investor funds

In 2014, 2015, and 2016, Essex lost a staggering amount of money.  Its losses from operating activities exceeded $31 million in that period.  But as Essex struggled with a leasing revenue shortfall, defendants continued to raise more than $30 million from advisory clients of DIA and Granger.  When doing so, they engaged in fraud.

To prove false and misleading statements and omissions, in violation of both Section 17(a) and Section 10(b), the SEC must show that the defendants, with the requisite state of mind, made material misrepresentations or omissions in connection with the purchase or sale of a security, or obtained money by means of these false statements in the offer or sale of a security.  *See SEC v. Platforms Wireless Intern. Corp.*, 617 F.3d 1072, 1092 (9th Cir. 2010).  Defendants' misstatements and omissions must concern material facts.  *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988); *TSC Industries., Inc. v. Northway*, Inc., 426 U.S. 438, 449 (1976).  A fact is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision.  *See id.*; *Platforms Wireless*, 617 F.2d at 1092.  Liability arises not only from affirmative representations but also from failures to disclose material information.  *SEC v. Dain Rauscher*, 254 F.3d at 855-56.  The antifraud provisions impose "'a duty to disclose material facts that are necessary to make disclosed statements, whether mandatory or volunteered, not misleading.'"  *SEC v. Fehn*, 97 F.3d 1276, 1290 n.12 (9th Cir. 1996).

The SEC has proven three sets of material misrepresentations and omissions by Iannelli and Essex.  First, in the course of procuring more than $7 million in investments from DIA's clients, Iannelli provided DIA with false financial statements

1    that inflated the company's asset values by tens of millions of dollars.  When Essex

2    restated those financials, years later, the correction swung the company's reported

3    financial condition to such a great extent that Essex's independent accountant

4    included going concern notes to each of Essex's restated financials.  Defendants

5    misrepresentations were plainly material.  *See SEC v. Murphy*, 626 F.2d 633, 653 (9th

6    Cir. 1980) ("surely the materiality of information relating to financial condition,

7    solvency and profitability is not subject to serious challenge").

8         Second, Essex and Iannelli never assigned a single lease to the Granger-funded

9    LLC investment vehicles, a structure that Granger and Essex agreed upon because

10   Granger "wanted a vehicle that had our name on it," with "our assets put in there," in

11   which Granger's clients would be fully-secured by equipment held in the LLC

12   vehicle itself.  Defendants could not follow through on their representations because

13   the equipment in Essex's leasing portfolio had already been pledged as collateral for

14   Essex's commercial bank loans.  Had Granger known this, it would not have invested

15   its clients in Essex.  Moreover, Iannelli promised to match every dollar invested by

16   Granger's clients, and he never did.  The $23 million cash-inflow Essex raised from

17   Granger clients was the product of a fraud.

18        Third, and finally, Iannelli made an absurd amount of personal guarantees to

19   his promissory note investors – $60 million in all – despite lacking the financial

20   wherewithal to follow through on that commitment.  Iannelli's financial guarantee

21   was a key consideration in DIA's decision to invest its clients with Essex, yet DIA

22   was given no hint as to the true extent of the debt guaranteed by Iannelli at the time.

23   When questioned on whether he had ever disclosed that fact to the many investors

24   receiving his financial guarantee, Iannelli glibly claimed that "no one ever asked me."

25                **3.    Essex's promissory notes are securities**

26        The promissory notes Essex offered by Essex to Iannelli's friends and business

27   associates, DIA clients, and Granger clients, are securities in the form of investment

28   contracts.  In *SEC v. W. J. Howey Co.*, 328 U.S. 293, 298-99 (1946), the Supreme

Court defined an investment contract to require:  (1) the investment of money; (2) in a common enterprise; (3) with an expectation of profits to be derived solely from the efforts of the promoter or a third party.  Each element is met here.

First, Iannelli solicited investors to provide funding for Essex.  Second, the "common enterprise" prong of the *Howey* test is satisfied by the existence of either horizontal commonality (pooling of investor funds and interests) or narrow vertical commonality (the fortunes of the investors are linked with those of the promoter). *SEC v. R.G. Reynolds Enters., Inc.*, 952 F.2d 1125, 1130 (9th Cir. 1991).   Horizontal commonality was present since Iannelli pooled investor funds into a common bank account and used these funds to operate Essex.  *See R.G. Reynolds Enter., Inc.*, 952 F.2d at 1134 ("The pooling of investors' funds to finance the construction of a plant where their ore was to be refined establishes horizontal commonality.")  Moreover, Essex made Ponzi-styled payments to investors.  *See SEC v. SG Ltd.*, 265 F.3d 42, 51 (1st Cir. 2001) (Ponzi schemes typically satisfy the horizontal commonality standard).  Narrow vertical commonality was also present.  Essex's business model was that it would purchase equipment, lease it at 10% interest rate, and pay investors up to 8.5% on their invested funds.  Therefore, based on this model, Essex's fortunes were tied to those of its investors – the way that Essex generated a profit from its leases and the way that investors would recognize a return on its investments were the same, namely, via the equipment leasing revenue from Essex's lessees.  *See R.G. Reynolds Enter., Inc.*, 952 F.2d at 1134 (narrow vertical commonality can be shown by an "arrangement to share profits on a percentage basis" between an investor and a promoter).  Third, investors reasonably expected to profit from their investments based on the efforts of Essex and Iannelli.  Iannelli was solely responsible for Essex and its continued operations (equipment purchases, lease negotiations with third party start-up companies, and lease collection efforts), and was wholly responsible for deriving returns for the entirely passive Essex promissory note investors. Defendants' fraud was in connection with the purchase or sale of a security, as well

as in the offer or sale of a security.[2]

### 4.    Iannelli and Essex acted unreasonably and with scienter

Defendants acted unreasonably and with scienter.  While claims under Section 10(b) and Section 17(a)(1) require a showing of scienter, Sections 17(a)(2) and (3) only require a showing of negligence.  *See Aaron v. SEC*, 446 U.S. 680, 701-02 (1980); *Vernazza v. SEC*, 327 F.3d 851, 859-60 (9th Cir. 2003).  Scienter is proven with "'knowing or reckless conduct,' without a showing of 'willful intent to defraud.'"  *Vernazza*, 327 F.3d at 860; *Hollinger v. Titan Capital Corp*., 914 F.2d 1564, 1568-69 (9th Cir. 1990).   To establish negligence, the SEC must show that the defendants failed to conform to the standard of care that would be exercised by a reasonable person.  *See Dain Rauscher*, 254 F.3d at 856; *SEC v. Hughes Capital Corp*., 124 F.3d 449, 453–54 (3d Cir.1997) (defining negligence in the securities context as the failure to exercise reasonable care or competence).

Iannelli's course of conduct was not just unreasonable under the circumstances; he also acted either knowingly or recklessly when carrying out the foregoing fraud. First, with respect to Essex's concerted pattern of making Ponzi-like payments to meet its ongoing obligations to investors, the frequency and extent to which Iannelli

---

[2] Separately, the promissory notes that Essex issued to Iannelli's friends and business associates and to DIA's clients are also securities under *Reves v. Ernst & Young*, 494 U.S. 56 (1990).  The notes issued by Essex satisfy the four *Reves* factors.  First, Essex issued notes to raise money for its operations, and in exchange, offered noteholders interest rates averaging 8%.  From both sides, the transaction is "most naturally conceived as an investment in a business enterprise."  Id. at 68.  Second, under Reves, "common trading" is established if the notes are "offered and sold to a broad segment of the public."  *Id*. at 68.  Though the notes were not publicly traded, since 2014 Essex issued over 100 promissory notes to at least 70 investors, raising over $80 million.  *See SEC v. R.G. Reynolds Enterprises, Inc*. 952 F.2d 1125, 1131 (9th Cir.1991) ($2 million raised from 148 investors were offered to a broad segment of the public).  Third, a reasonable investor would believe that the promissory notes were investments; for example, DIA recommended the notes to its clients as investments.  Fourth, there are no risk-reducing factors such as another regulatory scheme that would make application of the securities laws unnecessary.  The notes are unsecured and uninsured, and would escape federal regulation entirely if the securities laws were held not to apply.

resorted to those tactics, along with his intimate knowledge of Essex's intractable financial difficulties, demonstrate Iannelli's scienter.

Second, Essex's false financial statements were predicated on an incorrect share count for the company's stock holdings in Revance, one of its lessees. Those false financials were prepared on the assumption that Essex owned 1.5 million shares, when in truth the company's holdings were in the range of 145,000 shares. Iannelli knew that truth: more than a year before Essex provided its false financials to DIA, Iannelli had received, on three occasions, documentation from Revance and its transfer agent showing that Essex owned nothing close to the 1.5 million shares that its independent accountant had been led to believe.

Third, defendants' representation that Granger's clients would be secured by and hold an ownership interest in the equipment leases financed by their investments was likewise knowingly false when made. Because Essex's acquired equipment was being pledged to its bank lender, it was impossible for Essex to follow through on its promise, and Iannelli knew that. And so when Iannelli purported to execute written assignments of leases to the Granger LLC vehicles, he deliberately excluded any list or schedule identifying the leases Essex had purportedly assigned.

Fourth, Iannelli testified that he knew that his personal guarantee, on its own, could not provide assurance for all the debt he was taking on, on behalf of Essex, because the debt he was guaranteeing far exceeded his net worth. Nonetheless, Iannelli hid that material fact from Essex's investors on the pretext that "no one ever asked me."

And last, Essex acted with scienter because Iannelli is its owner, operator, and representative; this Court may accordingly impute Iannelli's scienter to Essex. *See SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1089 n.3 (2d Cir. 1972); *SEC v. Franco*, 253 F. Supp. 2d 720, 728 (S.D.N.Y. 2003) ("a person's knowledge can be attributed to a corporation in connection with actions which that person through his control causes the corporation to take."); *In re Parmalat Securities Litigation*, 684 F.

1  Supp. 2d 453, 471 (S.D.N.Y. 2010).

2  **C.   This Court Should Issue a Preliminary Injunction Because**

3  **Defendants' Violations Are Likely To Continue**

4  Iannelli and Essex should be preliminarily enjoined because there is a

5  reasonable likelihood their violations will be repeated unless they are restrained.

6  Whether a likelihood of future violations exists depends upon the totality of the

7  circumstances.  *See SEC v. Murphy*, 626 F.2d 633, 655 (9th Cir. 1980); *SEC v. Fehn*,

8  97 F.3d 1276, 1295-96 (9th Cir. 1996).  The existence of past violations may give rise

9  to an inference that there will be future violations.  *See Murphy*, 626 F.2d at 655; *SEC*

10  *v. United Financial Group, Inc.*, 474 F.2d 354, 358-59 (9th Cir. 1973); *see also U.S.*

11  *v. Odessa Union Warehouse Co-Op*, 833 F.2d 172, 176 (9th Cir. 1987).  Courts also

12  consider factors such as the degree of scienter, the isolated or recurrent nature of the

13  violative conduct, the defendant's recognition of the wrongful nature of the conduct,

14  the likelihood that, because of the defendant's occupation, future violations may

15  occur, and the sincerity of defendant's assurances against future violations.  *See*

16  *Murphy*, 626 F.2d at 655.

17  Essex is operating at a severe deficit.  Iannelli claims to have a plan to pull his

18  company out of this tailspin, but the only means for him to do so are to convince

19  Essex's bank to resume lending and, critically, recommence raising funds from

20  individual promissory note holders.  That is because a substantial amount of Essex's

21  current promissory note obligations are maturing, while at the same time, the majority

22  of Essex's actual income from leasing operations is being used to pay its bank debt.

23  The only way for Essex to meet its promissory note obligations is to raise new

24  money.  Iannelli steadfastly wants to continue his business.  But without an influx of

25  new investor funds – and a resumption of Essex's Ponzi-styled use of those incoming

26  investor funds to service its debt to existing promissory note investors, all in

27  continuing violation of the federal securities laws – he can't do that.

28

**D.     This Court Should Grant the Additional Relief Sought by the SEC**

**1.     An asset freeze is warranted**

Federal courts have inherent equitable authority to freeze assets under their "inherent equitable power to issue provisional remedies ancillary to its authority to provide final equitable relief." *Reebok Int'l, Ltd v. Marnatech Enterprises, Inc*., 970 F.2d 552, 559 (9th Cir. 1992); *SEC v. Wencke*, 622 F.2d 1363 at 1369 (1980).  These powers include the authority to freeze assets of both parties and nonparties.  *SEC v. Hickey*, 322 F.3d 1123, 1131 (9th Cir. 2003); *SEC v. Int'l Swiss Invs. Corp*., 895 F.2d 1272, 1276 (9th Cir. 1990).  Courts use freeze orders to prevent waste and dissipation of assets and to ensure their availability for disgorgement for the benefit of victims of the fraud.  *See, e.g., Hickey*, 322 F.3d at 1132; *Manor Nursing*, 458 F.2d at 1105-06. Indeed, the Ninth Circuit has found that "the public interest in preserving the illicit proceeds [of a defendant's fraud] for restitution to the victims is great."  *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1236 (9th Cir. 1999).  Courts have similarly recognized that a disgorgement order can be rendered meaningless unless an asset freeze is entered at the outset of the case.  *See SEC v. Unifund SAL*, 910 F.2d 1028, 1041 (2d Cir. 1990).  "A party seeking an asset freeze must show a likelihood of dissipation of the claimed assets, or other inability to recover monetary damages if relief is not granted."  *Johnson v. Couturier*, 572 F.3d 1067, 1085 (9th Cir. 2009). Courts consider a defendant's prior unlawful acts and the location of the assets in considering whether an asset freeze is warranted.  *See, e.g., id*. at 1085; *Affordable Media,* 179 F.3d at 1236; *Manor Nursing*, 458 F.2d at 1106.

In the last year, Essex has liquidated millions of dollars in securities, transferred stock holdings, and encumbered its investment portfolio with a multi-million dollar margin loan, all in an effort to stay financially afloat.  In addition, Essex has agreed to redeem a select few investors in full, thereby ensuring that some of its noteholders, but not others, will be made whole.  Given the threat of preferential investor treatment, this Court should issue an asset freeze and, as discussed below,

23

1    appoint an equity receiver over Essex.

2            **2.     This Court should appoint a permanent receiver over Essex**

3            The Court has broad discretion to appoint an equity receiver in SEC

4    enforcement actions.  *See Wencke*, 622 F.2d at 1365.  The breadth of this discretion

5    "arises out of the fact that most receiverships involve multiple parties and complex

6    transactions."  *SEC v. Capital Consultants*, *LLC*, 397 F.3d 733, 738 (9th Cir. 2005)

7    (quotation omitted).  A receiver plays a crucial role in preventing further dissipation

8    and misappropriation of investors' assets.  *Wencke*, 783 F.2d at 836-37 n.9.  Factors

9    such as the integrity of management and the likelihood of future misuse of assets are

10   critical in determining whether a receiver should be appointed.  *See SEC v. Fifth Ave.*

11   *Coach Lines, Inc.*, 289 F. Supp. 3, 42 (S.D.N.Y. 1968).  Courts have found a

12   receivership to be justified where management of an entity, collection of revenue, and

13   or distribution of investor funds are required.  *See, e.g., SEC v. Credit First Fund*,

14   2006 WL 4729240, at *15 (C.D. Cal. 2006).

15          Iannelli should not be allowed to continue his control of Essex.  To begin with,

16   Iannelli and Essex engaged in fraud, and the object of that fraud was to preserve the

17   illusion that Essex's business model worked.  But there is no real dispute that it

18   didn't.  And at this point, the toothpaste cannot go back in the tube.  Essex's financial

19   condition is precarious and it appears to have no reasonable prospect of returning to

20   profitability without resorting to the same pattern of misconduct that forms the basis

21   for this case in the first instance – raising new money from investors to stay current

22   on Essex's debt obligations to old investors.

23          The risk of keeping Essex under Iannelli's control has already coalesced.  As

24   one example, when Iannelli restructured the debt of one promissory note holder last

25   year – a social friend of his – Iannelli transferred $900,000 in securities to secure the

26   note holder's agreement to defer payment to a later date.  Iannelli has also fully

27   redeemed certain investors, while knowing that if all of his noteholders sought to

28   redeem their mature debt, Essex could not conceivably honor those requests.  That is

precisely why a receiver should be appointed to assess Essex's financial affairs and make a recommendation on how to proceed that is aimed at arriving at a fair and equitable outcome for all of Essex's investors, not just those with the good fortune of being able to secure a favorable deal with Iannelli directly.

### 3. Accounting and preservation orders are needed

The Court's broad equitable powers in SEC enforcement actions include the ability to order ancillary relief to require an accounting and prohibit document destruction. *See Wencke*, 622 F.2d at 1369. The Court should enter an order prohibiting the destruction of documents and requiring the defendants to prepare accountings, so the SEC can identify all available assets, to help ensure that funds and assets are frozen properly and available to satisfy any future order of disgorgement or civil penalties against defendants. *See Int'l Swiss Invs. Corp.*, 895 F.2d at 1276.

## IV.  **CONCLUSION**

For the foregoing reasons, the SEC respectfully requests that the Court grant its motion for a preliminary injunction.

Dated:  June 5, 2018

                              */s/ Gary Y. Leung*
                              GARY Y. LEUNG
                              DOUGLAS M. MILLER
                              YOLANDA OCHOA
                              Attorneys for Plaintiff
                              Securities and Exchange Commission

25

## **PROOF OF SERVICE**

I am over the age of 18 years and not a party to this action.  My business address is:

U.S. SECURITIES AND EXCHANGE COMMISSION,
444 S. Flower Street, Suite 900, Los Angeles, California 90071
Telephone No. (323) 965-3998; Facsimile No. (213) 443-1904.

On June 5, 2018, I caused to be served the document entitled **SEC'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION, APPOINTMENT OF A RECEIVER, ASSET FREEZES, AND OTHER RELIEF** on all the parties to this action addressed as stated on the attached service list:

☐ **OFFICE MAIL:**  By placing in sealed envelope(s), which I placed for collection and mailing today following ordinary business practices.  I am readily familiar with this agency's practice for collection and processing of correspondence for mailing; such correspondence would be deposited with the U.S. Postal Service on the same day in the ordinary course of business.

☐ **PERSONAL DEPOSIT IN MAIL:**  By placing in sealed envelope(s), which I personally deposited with the U.S. Postal Service.  Each such envelope was deposited with the U.S. Postal Service at Los Angeles, California, with first class postage thereon fully prepaid.

☐ **EXPRESS U.S. MAIL:**  Each such envelope was deposited in a facility regularly maintained at the U.S. Postal Service for receipt of Express Mail at Los Angeles, California, with Express Mail postage paid.

☒ **HAND DELIVERY:**  I caused to be hand delivered each such envelope to the office of the addressee as stated on the attached service list.

☐ **UNITED PARCEL SERVICE:**  By placing in sealed envelope(s) designated by United Parcel Service ("UPS") with delivery fees paid or provided for, which I deposited in a facility regularly maintained by UPS or delivered to a UPS courier, at Los Angeles, California.

☐ **ELECTRONIC MAIL:**  By transmitting the document by electronic mail to the electronic mail address as stated on the attached service list.

☒ **E-FILING:**  By causing the document to be electronically filed via the Court's CM/ECF system, which effects electronic service on counsel who are registered with the CM/ECF system.

☐ **FAX:**  By transmitting the document by facsimile transmission.  The transmission was reported as complete and without error.

I declare under penalty of perjury that the foregoing is true and correct.

Date: June 5, 2018                    */s/ Gary Y. Leung*
                                      GARY Y. LEUNG

1

*SEC v. RALPH T. IANNELLI, et al.*
**United States District Court—Central District of California**
**Case No. 2:18-cv-05008**

### <u>SERVICE LIST</u>

Ralph T. Iannelli
1486 East Valley Road
Montecito, CA 93108

Essex Capital Corporation
1486 East Valley Road
2nd Floor
Montecito, CA 93108

2