# EXHIBIT 4

Page 125

1  between the Essex capital and the lenders.

2      Q    Who suggested them?  Was it your idea or

3  theirs?

4      A    I think it was primarily -- I think it was both

5  of ours because people were getting a high rate of

6  return.  They wanted the flexibility if they needed the

7  liquidity.  So I think it was a mutually agreed upon -- I

8  don't think it was.  It was a mutually agreed upon

9  decision.

10     Q    So, for example, you see the fourth entry or

11  the fourth row on government exhibit 109 first page,

12  which is a trust, and it has a maturity date of 2014,

13  7/28/2014?

14     A    Uh-huh.  Right, and that's been perpetually

15  rolled over with a 180-day extension.

16     Q    How does that work?  Does that mean they have

17  to give you notice that they actually want to --

18     A    They have to give six months notice.

19     Q    If not, their note automatically --

20     A    Well, yeah, I mean, if they called up tomorrow

21  and said they wanted the money back, it would be six

22  months.  If it went until the beginning of December and

23  they called, it would be six months.

24     Q    Okay.  And with -- you responded that

25  Government Exhibit 109, you had personally guaranteed all

EXHIBIT 4 PAGE 122

Page 126

1    those funds in the first page.  What about the second
2    page of the advertising?
3        A    Guaranteed as well.
4        Q    So all promissory notes are personally
5    guaranteed?
6        A    Yes.
7             BY MR. BLAU:
8        Q    So between Exhibit 108 and 109 as of April, you
9    personally guaranteed $15 million worth of promissory
10   notes?
11       A    Whatever is on here, yeah.  Obviously, the P&I
12   have been reduced and the principal has been reduced.
13            MS. OCHOA:  I've now handed you what's been
14   marked as Government Exhibit 110.  I'm handing you a copy
15   of Government Exhibit 110 to your attorney.
16                          (SEC Exhibit No. 110 was marked
17                          for identification.)
18            BY MS. OCHOA:
19       Q    If you could look at Government Exhibit 110
20   while I describe it for the record?
21       A    Right.
22       Q    Government Exhibit 110 is a three-page
23   document.
24       A    Right.
25       Q    It was produced by you or by Essex Capital

EXHIBIT 4 PAGE 123

Page 127

1    Corporation as a spreadsheet with two tabs.

2         A    Right.

3         Q    The very first tab of Government Exhibit 110 is

4    printed as page -- as page 1 and page 2, and it's Bates

5    numbered ECC0049681.

6         A    Right.

7         Q    The second tab of Government Exhibit 110, which

8    is the third page of government exhibit 110.   The second

9    tab of the spreadsheet that you produced, which is the

10   third page of government exhibit 110 is Bates numbered

11   ECC004968-2.

12        A    Right.

13        Q    Let's look at first -- let's start with the

14   last page of Government Exhibit 110, which is

15   ECC004968-2.

16        A    Right.

17        Q    Do you recognize --

18        A    I do.

19        Q    Do you recognize Government Exhibit 110?   I

20   know you just answered, but I'm repeating the question so

21   I can go ahead and get it all in.

22        A    Okay.   To me, 110 is three pages.

23        Q    Yes.

24        A    I misunderstood.   I thought you asked have I

25   recognized the third page of 110.

EXHIBIT 4 PAGE 124

Page 128

1      Q    I'm asking do you -- well, do you recognize the
2   first -- all three pages of Exhibit 110?
3      A    Yes, I do.  Sorry.
4           MR. DENEVE:  Wait until she finishes.
5           THE WITNESS:  Yep.
6           BY MS. OCHOA:
7      Q    So looking at the third page of Government
8   Exhibit 110, what is it?  And that's the one Bates
9   labeled 4968-2, for the record.
10     A    Right.  This is a spreadsheet that is dated as
11  of April 15, 2017, and it is the monthly payment schedule
12  for the two Granger entities.
13     Q    And that's the Essex Granger LLC and Essex
14  Granger 2, LLC; correct?
15     A    LLC, 2 -- oh, you're right.  2 LLC.  Sorry.
16     Q    Okay.  So could you walk me -- who maintains
17  this?
18     A    We do.  Kelly.
19     Q    Kelly does?
20     A    Yeah.
21     Q    Who gave Kelly the information to put into this
22  spreadsheet?
23     A    I did initially.
24     Q    Okay.  And when was that?  When did you give
25  that initial information?

EXHIBIT 4 PAGE 125

Page 129

1    A.    When the first -- I guess in February or March
2   of 2016.
3        Q    Okay.  So will you walk us through this and
4   explain to us what it shows?
5        A    Sure.  This represents amortization schedules
6   for multiple transactions.  It shows what the principal
7   amount of the contribution was.  This shows the interest
8   rate.  It shows the payment and how many payments were
9   made.  It shows the term of two, three, or four years,
10   and it shows the monthly payments that were due, which
11   would amortize the original principal.
12        Q    So this is -- so looking at -- let's look at
13   the very first set of -- set of cells on the third page
14   of Government Exhibit 110.
15        A    Yes.
16        Q    That's the chart below the Essex Granger, LLC.
17        A    Uh-huh.
18        Q    Let's look at the row that starts with Apeel.
19        A    Okay.
20        Q    Okay?  And it has a note date of March 15,
21   2016, a maturity date of February 15, 2019.  Original
22   principal is 1 million, and a current balance of
23   $639,251.42, with 8 percent interest, three years and
24   periodic payment amount and a due date the 15th?
25        A    Yes.

EXHIBIT 4 PAGE 126

Page 137

1    if you have a copy or not.  I believe you do because, you
2    know, I think we made it available.  It talked about the
3    deficiencies under the terms of the agreement and my
4    intent to remedy deficiencies.  And we are remedying -- I
5    can't say the word, remedying those deficiencies.
6            One of the problems we had was that we had
7    commitments from lessees to lease large amounts of
8    equipment.  They didn't live up to their agreement to do
9    that.  We found ourselves with insufficient number of
10   leases to allocate, continued to make the payments,
11   continued to amortize the overall obligation.  The
12   original was 23,600,000, I believe.  I think that's down
13   to about 10,200,000 or something.  But in March we
14   received the subpoena.  I'm not blaming the subpoena that
15   we couldn't, but it slowed us down.  We are still trying
16   to find leases.
17           We lost our ability to use Montecito Bank and
18   Trust as a funding source.  Not lost.  They decided not
19   to fund us anymore until there's a resolution.  So right
20   now while we're financially on track, we're not
21   structurally on track.  I think that's the best way I can
22   put it.  And we have not assigned the leases because I
23   made a mistake, and I thought that there could be a
24   partial assignment, even though using you as an example,
25   Boxed was $8,741,000 lease.  Montecito Bank and Trust

EXHIBIT 4 PAGE 127

Page 143

1   converging together.  Okay?  Certainly when I sent that
2   letter, it confirmed what I believed they already knew.
3   I think that there are e-mails which might have
4   established an earlier date.  But I do remember with Jim
5   Boden, not their auditor, but their tax guy, that we had
6   a conversation fairly early that, in fact, due to the
7   circumstances we've discussed, those leases were
8   unassignable.  And there wasn't a conversation by them
9   saying okay.  Well, cancel the deal.  And I continued to
10  make the payments to this day.  Okay?
11          Now, in that letter I also said that we intend
12  to live up to our terms of the deal, which call about an
13  assignment of residual and talk about an assignment of
14  warrants; right?  That's what we're going to do.  We will
15  do it, and we will continue to make the payments because
16  I gave my word I was going to do it, and I'm going to do
17  it.
18      Q   So you said the money from Ogin and Solexel
19  hasn't been coming, but you've been making the payment?
20      A   That's correct.
21      Q   So what's the source of funds that you're using
22  to make the payment?
23      A   All sorts of funds coming into Essex.
24      Q   Is it possible that some promissory note
25  holders funds are used to pay the Essex Granger LLC?

EXHIBIT 4 PAGE 128

Page 144

1       A    My wife's been saving for 15 years for an

2   annuity for a million dollars.  She put a million dollars

3   into Essex.  Look, I -- let me take a moment.  Okay?

4       Q    Do you want to go off the record?

5       A    Yeah.

6            MS. OCHOA:  Off the record at 3:00 p.m.

7            (A brief recess was taken.)

8            MS. OCHOA:  Back on the record at 3:12 p.m. on

9   Wednesday, November 15th.  Okay.

10           BY MS. CHANG:

11      Q    Okay.  So we're going to change topic.  Let's

12  talk about financial statement?

13      A    Right.

14      Q    Can you tell me, please, when did you first

15  retain external accounting to help you with financial

16  statements?

17      A    I believe it was 2012.

18      Q    And who did you hire back in 2012?

19      A    Damitz, Brooks, blank, blank, blank.  Chris

20  Harris, specifically.  He was assigned to me.

21      Q    Okay.  And why did you decide to engage in

22  2012?

23      A    It wasn't just 2012.  I decided to hire

24  external accountants -- I had intention of

25  institutionalizing the business and becoming less reliant

EXHIBIT 4 PAGE 129

Page 145

1   on non institutional lenders.  And I thought that by
2   having external financial -- or financial statements
3   prepared by outside accountants, initially on a reviewed
4   basis, that it would be beneficial to the growth of the
5   company and allow me to grow the business more
6   effectively.  Said in a nutshell, institutions like to do
7   business with institutions.
8       Q    So prior to 2012, did you have anybody helping
9   you compile financial --
10      A    Yes, yeah.  I had an accountant, who also
11  happened to be an attorney.  His name was Gary Yoshimura.
12
13      Q    And did he perform any review or audit for your
14  financial statements?
15      A    No.  No.  Basically Gary was a tax guy.  We
16  didn't really have an audit -- not audit in the sense of
17  an audited statement, but somebody, you know, as opposed
18  to an auditor -- as opposed to a tax person.
19      Q    And why didn't you have your external
20  accountant perform audit for your financial statement
21  subsequent to your --
22      A    You mean a full blown audit?
23      Q    Yes.
24      A    Expense.
25      Q    Is that the only reason?

EXHIBIT 4 PAGE 130

Page 155

1  in our brokerage account and then some shares remained at

2  the transfer agent for almost nine months.

3          I didn't know exactly how many shares we

4  owned.  It was a very complex cap structure, and no

5  matter -- I just -- but it did appear that he might not

6  -- this was just one theory I had, that he might not have

7  picked up the 10-for-one reverse split because the number

8  of shares we had was -- I found out later exaggerated

9  almost nine or 10 to one.

10          But then he showed me, as I mentioned, about

11  the confusion in the bridge loan and the confusion

12  between Essex World Ones and Essex Capital.

13          BY MS. OCHOA:

14     Q     So you reviewed the financial.  This is a

15  compilation.  So you have to review it; correct?

16     A     I was responsible.

17     Q     Why didn't you catch the difference of $50

18  million?

19     A     I didn't.

20     Q     Why not?

21     A     I didn't know how much shares we owned.  I can

22  tell you I thought it was an inflated figure, but I

23  couldn't tell you to what degree it was an inflated

24  figure.  Okay?  I can only tell you what I thought, and I

25  can only tell you what I did.

EXHIBIT 4 PAGE 131

Page 157

1    statements?

2         A    Yes, because I thought we did.

3         Q    What was your basis for thinking that?

4         A    Because I was getting account statements from

5    the transfer agent that showed it.

6         Q    And what -- and what were the number of shares

7    showed?

8         A    I can't remember, but there was a time when it

9    appeared that we had shares as a transfer agent and when

10   we had shares at the brokerage accounts.

11             MS. OCHOA:   I've handed you what I've just

12   marked as Government Exhibit 111.   A copy has been handed

13   to your attorney.   Take a look at Government Exhibit 111

14   while I describe it for the record.   Government Exhibit

15   111 is Bates No. Revance-SEC-00001345 all the way through

16   the rest of the -- all the way through -- the rest of the

17   Bates numbers of SEC- -- Revance- SEC-00001346-17.

18                       (SEC Exhibit No. 111 was marked

19                       for identification.)

20             THE WITNESS:   Right.

21             BY MS. OCHOA:

22         Q    The top of the e-mail appears to be a message

23   from David Styka?

24         A    Right.

25         Q    E-mail dstyka revance.com to ralph

EXHIBIT 4 PAGE 132

Page 158

1   essexcapitalcore.com sent on Wednesday January 22, 2014,
2   with an attachment entitled "Revance Pro Forma Cap Table
3   IPO." On top of the e-mail it says, "Ralph, per your
4   request on the board call, please find attached the pro
5   forma cap table regards, and, then attached to it are
6   several documents.  A very large spreadsheet that we've
7   printed and I referenced that begins in Bates 13461
8   through 17, and it appears to be a cap table.
9       A    Right.
10      Q    Do you -- do you recognize Government Exhibit
11   111?
12      A    I recognize it.  There's two e-mails to me with
13   -- with what appears to be a detailed capitalization
14   table.
15      Q    Okay.  And who is David Styka?
16      A    I think his title was controller.
17      Q    Okay.  And then -- it says based on the e-mail,
18   you were on a board call and you requested a pro forma
19   cap table.
20          Do you recall doing that?
21      A    Yes -- well, no.  I don't recall specifically
22   asking for it, but I must have because he sent it to me.
23      Q    Okay.  So if we look at -- did the -- did the
24   joint -- so it during the January period of board calls,
25   were you discussing the reverse -- the reverse split of

EXHIBIT 4 PAGE 133

Page 163

1           BY MS. OCHOA:

2       Q       Government Exhibit 112 is Bates No. REVANCE-SEC

3   00001848 through 1849-3.    It's 1848 through 1849-3.    The

4   very first page of Government Exhibit 112 appears to be

5   an e-mail sent on February 12, 2014 from David Styka to

6   ralph essexcapitalcore.com, copying Lauren Silvernail

7   subject, Essex capital equity holding.    And the second

8   page has a table, and it says Essex Capital Stock

9   summary.    The third page has a Revance -- has another

10  table entitled Revance Therapeutics Warrant Holder

11  Report.    And the last page has a Revance -- has another

12  table entitled Revance Therapeutics Inc. convertible

13  promissory notes ledger.

14          Do you recognize Government Exhibit 112?

15      A       Yes.

16      Q       Okay.    Tell me, what is Government Exhibit 112?

17

18      A       It would appear to be the number of shares

19  owned by Essex that weren't in the amount of a bridge

20  loan post IPO.

21      Q       Okay.    So in the top cover or the very first

22  page of Exhibit 112 David Styka appears to write, "Ralph,

23  I understand from Lauren that you were inquiring about

24  your equity holdings post IPO.    Attached please find our

25  pro forma estimate of your holdings post IPO.    The final

EXHIBIT 4 PAGE 134

Page 164

1    calculations are being vetted by our attorneys, and our
2    transfer agent and formal notification with the final
3    share calculations will be sent by the transfer agent in
4    the upcoming weeks."
5         A    Right.
6         Q    So you were asking David Styka? Was that the
7    case? You were asking David Styka what Essex Capital's
8    equity position was?
9         A    Based on the complexity of the cap table, I was
10   asking him how many shares we own.
11        Q    Okay. If you turn to the second page of
12   Government Exhibit 112 there's a -- there's an Essex
13   Capital stock summary, and it identifies your shares
14   presplit as 1,860,321, and then your total post split
15   shares at 145,501.
16             Do you see that?
17        A    Yes.
18        Q    Did you share this capital stock summary with
19   Chris Harris?
20        A    I do not remember.
21        Q    You do not remember one way or other whether
22   you shared it with him?
23        A    I don't remember if I did or not.
24        Q    Okay. So you said that you were confused about
25   the number of shares, but this is a very clear table.

EXHIBIT 4 PAGE 135

Page 165

1      So why was it that if this table basically
2  identifies, again, very clearly that your holdings are
3  closer to 150,000, why was it that you did not identify
4  the error in the financial statements, which had your
5  shares at closer to 1.5 million?
6      A    Because I was still waiting for final
7  resolution from the transfer agent as to the number of
8  shares.   Now, I was still waiting for a final resolution.
9
10     Q    So you thought your shares were going to
11  increase from 150,000 to over a million?
12     A    No.  I didn't know what they were going to
13  increase to.  I did not know what they were going to
14  increase to.
15     Q    Okay.
16          BY MR. BLAU:
17     Q    Did anyone at Revance give you any reason to
18  believe that your shares would increase from what they
19  told you in Exhibit 112?
20     A    No, other than the language of our transfer
21  agent formal notification with a final share calculation.
22  At that point I didn't know how many shares I was going
23  to get in from the bridge loan, even though it showed it.
24  Okay?  I didn't know where my shares were going to be.  I
25  knew that they would -- I felt they would go up.  I

EXHIBIT 4 PAGE 136

Page 166

1    didn't know if they would go up substantially or not.  I
2    know I got statements from the transfer agent after the
3    shares were in the Essex account.  I don't remember what
4    they aggregated to.
5            BY MS. CHANG:
6        Q    I understand that you testified that you do not
7    remember whether you shared this particular stock summary
8    with Chris Harris; is that correct?
9        A    Right.
10       Q    But as a general practice when Chris Harris was
11   preparing Essex financial statements, would this type of
12   document be something that you would have shared with
13   him?
14       A    I -- I -- look, we -- I -- my practice was to
15   turn everything over to Chris.  So I want to be careful
16   to say that I did or I didn't because I don't remember if
17   I did or I didn't.  My practice would have been to share
18   anything to do with any debit -- or pardon me.  Asset or
19   liability with Chris.
20           MS. OCHOA:  I'm now handing you what's been
21   marked as Government Exhibit 113.  A copy of Government
22   Exhibit 113 has been handed to your counsel.  Take a look
23   at Government Exhibit 113 while I describe it for the
24   record.  Government Exhibit 113 appears to be an e-mail
25   from you to Eckloff, Amerissa dated Wednesday March 19,

EXHIBIT 4 PAGE 137

Page 167

```
 1    2014, with an attachment that appears to be several
 2    shares from computer share regarding Revance Therapeutics
 3    summary of holdings.  The document is Bates numbered
 4    SEC_ESSEX_EM000001-00032 all the way through 34.
 5                            (SEC Exhibit No. 113 was marked
 6                            for identification.)
 7              BY MS. OCHOA:
 8         Q    Do you recognize Government Exhibit 113?
 9         A    Yes.
10         Q    Okay.  So what is Government Exhibit 113?
11         A    It appears to be the number of shares held in
12    the computer share account of Revance Therapeutics for
13    Essex Capital.
14         Q    Okay.  And those shares that we looked at, did
15    you forward this to Amerissa Eckloff?
16         A    It appears that I did.
17         Q    It appears that you did, but did you?  Do you
18    remember doing that?
19         A    Well, no, I don't remember, you know, in March
20    of 2014, but it would look like it was an e-mail from me
21    to her.
22         Q    Who is Amerissa Eckloff?
23         A    She was an administrative assistant at Merrill
24    Lynch.
25         Q    Okay.  Did you have -- do you have contact with
```

EXHIBIT 4 PAGE 138

Page 168

1      Amerissa Eckloff in connection with your Merrill Lynch
2      accounts?
3          A      Did I?
4          Q      Or do you generally?
5          A      Well, I don't believe she's working there
6      anymore.
7          Q      Well, did you in the past?
8          A      I did when she was there.
9          Q      Okay.   So if we turn to the third page of
10     Government Exhibit 113, which is Bates number 3034 --
11         A      Right.
12         Q      We have a closing position of Essex Capital
13     Corporations Holdings and Revance.
14         A      Uh-huh, right.
15         Q      And that position 113,329?
16         A      Right.
17         Q      And that's an amount that matches what the
18     closing position for Essex shares are, based on table?
19         A      Okay.
20         Q      So as of this point we see that document from
21     computer share confirming what Revance Holdings' were as
22     of March 12, 2014?
23         A      Right.
24         Q      Did you provide those to Chris Harris?
25         A      My normal course of activity would -- would

EXHIBIT 4 PAGE 139

Page 169

1    have been that I -- I did, I would have, but I can't

2    remember if I did or I didn't.

3         Q    Okay.

4         A    It was three years ago.

5         Q    Okay.  Well, we haven't seen it in the work

6    papers, and we haven't seen it in the e-mails of you

7    providing this to Chris Harris.

8         A    Okay.

9         Q    And, again, so looking at this, it's 113,000.

10   Again, we're closer to 113,000, were the actual shares --

11   which were the shares that you actually did hold.

12         Why is it that having this document,

13   Government Exhibit 113, having the cap table that we saw

14   as Government Exhibit 111, you didn't pick up the fact

15   that the 2015 financial statements overstated your equity

16   position by over 10 points -- over a million.

17         A    When Chris presented the financials to me, the

18   compiled financials, it showed $74 million worth of

19   marketable securities, which weren't all -- they weren't

20   all Revance, but the majority of them -- vast majority

21   were from Revance.  Okay?  I didn't question the number.

22   I should have questioned the number.

23         Later when I did question the number, Chris

24   gave me the reason that the number was 74 million as

25   opposed to 24 million was because of the problem -- his

EXHIBIT 4 PAGE 140

Page 170

1    misinterpretation of the S1.  If you tell me I didn't
2    send these documents to Chris, I guess I didn't send them
3    to Chris.  If Chris told you he didn't get them from me,
4    I guess I didn't do it.  Okay?  I mean, I --
5              BY MR. BLAU:
6         Q    Do you think you provided Chris Harris with
7    enough information to come up with the right answer as to
8    how many Revance shares you owned?
9         A    I didn't know how many Revance shares I owned,
10   so I don't -- to answer your question, if I didn't
11   provide Chris with this information, I didn't provide him
12   with adequate number -- adequate information.  Okay?
13             BY MS. OCHOA:
14        Q    So Government Exhibit 113 provides the number
15   of Revance shares that you owned?
16        A    Well --
17        Q    That's the number that you owned.  So how is it
18   that you could say that you didn't know the number of
19   shares that you owned?  You have a --
20        A    I didn't --
21        Q    -- March 19th e-mail telling you?
22        A    I didn't totally rely upon computer share and
23   the amount of shares that I owned.  Okay?  I didn't have
24   total confidence in it.  It doesn't mean that I wasn't
25   wrong, and it appears that I was wrong.

EXHIBIT 4 PAGE 141

Page 176

1   my answer was no, and I my answer remains no.

2      Q    Okay.  But you provided him financial

3   statements with information through September 2015?

4      A    As I stated.

5      Q    Right.  And that information is also incorrect;

6   right?

7      A    Well, it -- the year end was restated, so I

8   would imagine a quarterly -- it could be that the quarter

9   was right and the end of the year was wrong, but that

10  wasn't the case.  The -- the -- -- the 2014 and 15 were

11  restated.

12         BY MR. BLAU:

13      Q    Okay.  I guess the point was you provided him

14  with information that had the incorrect information about

15  the Revance shares that you didn't know; is that correct?

16

17      A    I provided Mr. Van Wyk the statement as of

18  9/30/2015 that would appear to have an inflated value for

19  the marketable securities, some of which were Revance.

20      Q    Okay.

21      A    I don't mean to be so didactic, but --

22      Q    That's an accurate answer?

23      A    I want to make sure we got it right.

24         MS. OCHOA:  Okay.  Let's go off the record at

25  4:10 p.m.

EXHIBIT 4 PAGE 142

```
 1                    PROOFREADER'S CERTIFICATE

 2

 3  In The Matter of:    ESSEX CAPITAL CORP.

 4  Witness:             Ralph Iannelli

 5  File Number:         LA-04787-A

 6  Date:                Wednesday, November 15, 2017

 7  Location:            Los Angeles, CA

 8

 9          This is to certify that I, Maria E. Paulsen,

10  (the undersigned), do hereby swear and affirm that the

11  attached proceedings before the U.S. Securities and

12  Exchange Commission were held according to the record and

13  that this is the original, complete, true and accurate

14  transcript that has been compared to the reporting or

15  recording accomplished at the hearing.

16

17                                          11/30/2017

18  (Proofreader's Name)              (Date)

19

20

21

22

23

24

25
```

EXHIBIT 4 PAGE 143

```
1                          CERTIFICATION

2                              OF

3                  CERTIFIED SHORTHAND REPORTER

4

5           I, the undersigned, a Certified Shorthand

6     Reporter of the State of California do hereby certify:

7           That the foregoing proceedings were taken

8     before me at the time and place herein set forth;

9     that any witnesses in the foregoing proceedings, prior

10    to testifying, were placed under oath; that a verbatim

11    record of the proceedings was made by me using machine

12    shorthand which was thereafter transcribed under my

13    direction; further, that the foregoing is an accurate

14    transcription thereof.

15          I further certify that I am neither financially

16    interested in the action nor a relative or employee of

17    any attorney of any of the parties.

18          IN WITNESS WHEREOF, I have this date

19    subscribed my name

20

21

22                              Lisa Hess

23                     Certificate Number 13045

24                     Dated:  November 15, 2017

25
```

Page 180

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

COPY

In the Matter of:          )
                           ) File No. LA-04787-A
ESSEX CAPITAL CORP.        )


WITNESS:  Ralph Iannelli
PAGES:    180 through 347
PLACE:    Securities and Exchange Commission
          Los Angeles Regional Office
          444 South Flower Street, Suite 900
          Los Angeles, California 90071
DATE:     Thursday, November 16, 2017


     The above-entitled matter came on for hearing
pursuant to notice at 9:49 a.m.




          Diversified Reporting Services, Inc.
                 (202) 467-9200

EXHIBIT 4 PAGE 145

Page 185

1              P R O C E E D I N G S

2           MS. OCHOA:  On the record on Thursday, November

3    16, at 9:49 a.m.  Mr. Iannelli, we are continuing with

4    our testimony as yesterday.

5           Do you understand you're still under oath?

6           WITNESS:  Yes.

7    Whereupon,

8                    RALPH IANELLI

9    was called as a witness and, having been previously duly

10   sworn, was examined and testified further as follows:

11                    EXAMINATION

12                    (SEC Exhibit No. 9 was referred

13                    to.)

14           BY MS. CHANG:

15    Q    Mr. Iannelli, I'm handing you what's previously

16   been marked as Government Exhibit 9.  Please take a

17   moment to review Exhibit 9 while I describe it for the

18   record.  Government Exhibit 9 appears to be an e-mail

19   chain of a multiple page document with Bates number

20   SEC-DBNTM-E-0028027 through 031.

21           On top of the first page is an e-mail from you,

22   Mr. Iannelli to Chris Harris sent on Thursday January 2,

23   2014, and the subject is regarding Revance Confidential

24   e-mail-S1 on file.  Correction the Bates number is from

25   last 0028027 through 032.

EXHIBIT 4 PAGE 146

Page 209

1    nowhere close to a million; right?

2        A    Right.

3        Q    So then when you see Chris Harris's e-mail a

4    year later, which is Government Exhibit 8 quoting or

5    citing 1.4 million shares, almost 1.5 million shares, did

6    you flag that as an issue for him?

7        A    I flagged it as an issue for him later when he

8    restated the 2014 and 2015 financials.

9        Q    Okay.  So you flagged it as an issue after you

10   received the SEC subpoena from us?

11       A    Yeah.  I received it in March -- the answer is

12   yes.

13       Q    Okay.

14            BY MR. BLAU:

15       Q    Did you share with Mr. Harris your brokerage

16   statement either Exhibit 114 or perhaps the one that came

17   after that?

18       A    Mr. Blau, I don't know if we sent him our

19   annual statements or if we sent him our monthly

20   statements, but certainly he would need to know -- he

21   would need to get some of the statements.  I could find

22   out whether they gave them to him monthly, quarterly, or

23   annually.  But he would have a copy of all the

24   statements.

25            MS. OCHOA:  I'm now handing you what I've

EXHIBIT 4 PAGE 147

Page 232

1      A     I was uncomfortable with the number -- I was

2   uncomfortable with the total number of shares that I

3   owned at that time even as late as that date with the

4   transfer agent, and that's why I made the statement that

5   I did.

6      Q     What statement are you referring to?

7      A     The statement of the number of shares that

8   Essex owned and the e-mail response to Davin Mantell.

9      Q     Okay.  So you were not comfortable -- what

10  you're saying is, and I don't want to put words in your

11  mouth, but I want to understand what your answer is.

12        Are you saying that you had doubts about

13  whether the brokerage account statements accurately

14  reflected your total number of shares, or are you saying

15  that you had doubts about whether the financial

16  statements accurately requested your total number of

17  shares?

18     A     The former.  And I had a financial statement

19  that showed pre -- I'm at a loss for words.

20  Prerestatement that showed that valuation.

21     Q     Okay.  So -- so once you received the SEC

22  subpoena, you went back and you were able to identify

23  that there was an issue; correct?

24     A     Yes.

25     Q     Okay.  So why weren't you able to do that in

EXHIBIT 4 PAGE 148

Page 233

1    April 2016?

2        A    A year earlier?

3        Q    Yes.   A year earlier and -- I know we're two

4    years after the IPO and over two years after the Computer

5    Share statement was issued?

6        A    Right, because I had a firm belief at the time

7    that there was an inaccuracy at that time.   And then

8    given the gravity of receiving a subpoena from the SEC, I

9    redoubled my efforts to try to make sure that I had it

10   right.

11       Q    And how did -- so did you -- after receiving

12   the SEC subpoena, did you contact Revance to ask them

13   about your missing shares or what you believed were your

14   missing shares?

15       A    No.

16       Q    Okay.   Did you contact Computer Share to ask,

17   "Where are these shares that I believed I owned but are

18   not showing up in my brokerage statement?"

19       A    I did contact Computer Share.   I did review,

20   and it became apparent to me at that time, I went back to

21   Chris Harris.   We had the conversation.   He explained why

22   the mistake was made about the misinterpretation of the

23   S1 and the contribution of the Essex to -- there was also

24   some -- some conversation about that maybe that there was

25   a mistake, but that was debunked about the reverse split.

EXHIBIT 4 PAGE 149

Page 235

1     Q     What number?

2     A     The number of Revance shares.

3     Q     On your brokerage statement?

4     A     No, not on my -- well, yeah, no, I'm sorry.  I

5     apologize, yeah.  I don't -- I thought that the -- the

6     number of shares on the brokerage statement were

7     accurate.  Okay?  I didn't think, though, I was getting

8     full credit after the IPO for all of the private equity

9     and bridge loan money I had put in.  The general counsel,

10    the outside counsel, Gordon Ho, said in 25, 30 years of

11    doing these deals, it was the most complicated cap table

12    he ever saw.  Okay?  It's not an excuse, just a fact.

13          What changed between then and getting a

14    subpoena from the SEC?  To someone who had been -- had a

15    problem with the SEC 44 years earlier, I was scared.

16    I -- I don't know how else to put it.  I -- it wasn't

17    like I was -- my financial statements that we had

18    prerestatement, sorry, and post -- we as I mentioned,

19    tried the institution our business, that's when I went to

20    a recognized auditor.  Not for audit, but a recognized

21    outside accounting firm.  You know, a regional firm, big

22    firm.

23          We were ramped up to start to do business, and

24    we had a number of bankruptcies, which hurt our business

25    dramatically.  I was like a one-armed paper hanger.  Okay?

EXHIBIT 4 PAGE 150

Page 256

```
 1      A    Right.
 2      Q    Okay.   So did Essex Capital ever assign --
 3   what's your position,  did Essex Capital ever contribute
 4   equipment leases to this -- to this -- to the LLC?
 5      A    Essex Capital contributed a number of equipment
 6   leases, but did not assign them.
 7      Q    Okay.  And when did you first tell Granger that
 8   the leases were not assigned?
 9      A    Okay.  So the first leases we did were in March
10   of '16.
11      Q    Okay.
12      A    And there was a conversation -- it was March
13   '16 or '15?  I'm sorry.  Do you have that exhibit that
14   showed the Granger -- the payments --
15      Q    The payment schedule?
16      A    Yeah.
17      Q    It's --
18      A    That would refresh my --
19      Q    So it's probably the chart towards the bottom.
20   I see it there.
21      A    It's the one that was in color.
22      Q    That's it.
23      A    It might be on the bottom.  No?
24      Q    So it's Exhibit 110, third page.
25      A    Okay.  Thank you.  And the question again?
```

EXHIBIT 4 PAGE 151

Page 266

1   amounts are on the right-hand side, and they're all on

2   the 15th of the month.  And that is just done for

3   purposes of convenience because some of the lease

4   payments came in on the 1st of the month, the 8th of the

5   month, the 20th of the month.

6       Q    Okay.

7       A    So I don't know if I answered the question.

8       Q    So some of the leases that were eventually put

9   as part of the portfolio of leases that we see listed in

10  Government Exhibit 110, page 3, some of those leases

11  predated -- as far as the origination date, if they

12  predated December 21, 2015; right?

13      A    That's right.  I'm sorry, what date?

14      Q    December 21, 2015?

15      A    Yes.

16      Q    So then as of December 21, 2015, did you know

17  that some of these leases were not going to be assignable

18  to Granger or to the Essex Granger activities?

19      A    As of what date?

20      Q    December 21, 2015.

21      A    At that point I believed that notes -- pardon

22  me.  Leases with an encumbrance -- that the bank, who was

23  Montecito Bank and Trust, that we were going to be able

24  to get a carve out or a portion of that lease that the

25  bank held the collateral under that lease, and we could

EXHIBIT 4 PAGE 152

Page 267

1    get a release from the bank.

2        Q    When did you reach -- did you reach out to the

3    bank in order to try to get a carve out?

4        A    We started preliminary conversations, and then

5    the subpoena was received by the bank.

6        Q    So approximately when did you start preliminary

7    conversations?

8        A    End of January, February.

9        Q    Of this year?

10       A    Of 2017.

11            BY MR. BLAU:

12       Q    Are those memorialized in any sort of letter

13   or e-mails?

14       A    I don't know.  But -- I don't know.

15       Q    Who were those preliminary discussions with?

16       A    Perhaps Skinner.

17            BY MS. OCHOA:

18       Q    And at any point -- were you going to say

19   something?

20       A    Sorry.  No, no.

21       Q    Between December 2015 and early 2017 did you

22   let anybody from Granger Management know that you had to

23   reach out to the bank in order to get -- to get carve

24   outs to assign leases?

25       A    We had had conversations with the -- with the

EXHIBIT 4 PAGE 153

Page 271

1    months after this exchange to let them know that no

2    assignment had been made period?

3         A    We had continual conversations, along with my

4    conversations with both their tax accountants and with

5    their auditors, that we would not be able to assign the

6    leases.  We continued to makes payments as we have

7    through the current time.  And as I mentioned, at some

8    point the communications stopped, other than an e-mail

9    from Gerri McManus to me when she and I had my surgery.

10   That's been the only contact -- other than with Ryan

11   Donovan at Granger, who's a principal and he -- we alert

12   him when the monthly payments are going to be made.

13        Q    At any point prior to receiving funds from

14   them -- let me restart.  The funds from Carnegie were

15   first paid in late October 2015; right?

16        A    Mid October, yeah.

17        Q    And then there was subsequent payments in early

18   2016; right?

19        A    That's correct.  Well, mid.

20        Q    Mid 2016?

21        A    Right.

22        Q    Okay.  And then had there was a final -- the

23   final note came in late 2016?

24        A    Yeah, the fall of 2016.

25        Q    So prior to any of those payments, did you let

EXHIBIT 4 PAGE 154

Page 272

1    them know that no assignment had been made?

2         A    Well, they knew that no assignment had been

3    made because -- I don't want this to sound snarky, but no

4    assignment had been made.  So it wasn't necessary for me

5    to let them know.  They were aware of it because their

6    auditors and their tax people, including Ryan Donovan,

7    knew that no assignment had been made.  There was an

8    assignment document signed, and that would be government

9    91.

10        Q    There were several assignment documents?

11        A    Yes.

12        Q    That was one of the --

13        A    Right.  But none of them had a list of the

14   assigned leases.

15        Q    So did you tell them that you were leaving out

16   the assigned leases intentionally then?  So it was

17   intentional to leave that exhibit -- the attached -- the

18   exhibit that it's supposed to be attached to.

19        So in Government Exhibit 91 there's a Schedule

20   A.

21        A    Yeah.

22        Q    Was it intentional to leave Schedule A blank?

23        A    Well, I want to try to understand the question.

24   I didn't assign anything.  So it wasn't a question of

25   intentional or unintentional.  It was just factual.  And

EXHIBIT 4 PAGE 155

Page 273

1  they were aware that there was no assignment because

2  Schedule A was blank.  So I understand the question.  I

3  don't understand the word "intentional."

4     Q    So why were you even going through the notions

5  of signing all these assignments with blank schedules if

6  you're not assigning anything?  Why don't you wait to

7  assign something before sending them an executed

8  assignment?

9     A    Because, well, on 12/21 for Government Exhibit

10 91 and 12/21 for Government 90 was in anticipation of an

11 assignment.  The promissory notes were to be assigned.

12 But as we've discussed, those were delayed, right, by

13 mutual consent.  But they signed the assignment and

14 documented the promissory notes, but say prematurely,

15 because they didn't get actually assigned until a later

16 date.  And then it was the intention to assign the leases

17 on 12/21/15, and that assignment never took place.

18    Q    So then the Government Exhibit 91, the

19 assignment of equipment leases, you're saying Exhibit 91

20 that was executed by you.  It was, in fact, ineffective;

21 right?  Is that what your testimony is?

22    A    I don't know what ineffective means.  Again,

23 I'm not trying to be a wise guy here.  I signed a

24 document in anticipation of something occurring.  For a

25 number of reasons some of which we discussed, and some of

EXHIBIT 4 PAGE 156

Page 275

1      Q    What do you mean by the money actually
2  transpired?   Because based on what we're looking at in
3  bank records, 4 million was deposited into Essex Capital
4  Corporation on October 21, 2015; 2 million was deposited
5  on November 5, 2015; 4 million was deposited on December
6  1, 2015; one million was deposited on February 6, 2016;
7  9.76 million was deposited May 5, 2016, and 2.6 million
8  was deposited on November 28, 2016.
9      A    Right.  And I agree with all those dates of
10 transfer.
11     Q    Okay.  So those were -- those are the dates, so
12 they transferred money over to Essex Capital Corporation?
13     A    Right.  I believe they were with First Republic
14 Bank.  I could be wrong, but I think they went to First
15 Republic.
16     Q    Okay.  So walk me through.  Let's start with
17 October 21, 2015.  So $4 million are transferred over,
18 what do you do with those $4 million?
19     A    The money is put into Essex Capital for the
20 purpose of acquiring the leases.  We pay the interest.
21 And at some point we converted those notes along with all
22 the other deposits that you just enumerated were
23 transferred -- oh, pardon me, were converted into
24 interest in the two LLCs.  It was -- so that's what
25 occurred.

EXHIBIT 4 PAGE 157

Page 276

```
 1      Q       So was any of that -- did any of that $4
 2  million -- was any of that used to actually fund
 3  equipment leases?
 4      A       Yes.
 5      Q       Okay.   And after you did that, did you try to
 6  assign those leases to Granger Management, those leases
 7  that the money was used in?
 8      A       As I mentioned, the intention was to assign
 9  those leases as per the agreement.
10      Q       But you were never able to?
11      A       We were never able to assign because the
12  communication stopped.   We were never able to assign
13  them.
14      Q       Okay.   Did you tell Granger Management that you
15  would be -- that you would be matching every dollar that
16  their clients invested with one dollar of your own or
17  Essex's own dollar.   So basically, that each investment
18  would be on a one-to-one basis?
19      A       Are you talking about on the size of a lease?
20      Q       Yeah, so if they invested $5 million, you would
21  also be investing in the $5 million?
22      A       Yes.
23      Q       Or whatever amount, $5 million in a lease.
24      A       What I believe I said was that if it was a $2
25  million lease, they would never own more than 50 percent
```

EXHIBIT 4 PAGE 158

Page 277

1    of the lease.   I believe that's what I said.

2        Q    Okay.   And who would own the -- did you

3    explain --

4        A    So if it was a $2 million lease with Essex,

5    they would own a million dollars, and we would own a

6    million dollars.   Ownership is determined by assignment.

7            MS. OCHOA:   I'm handing you what I've marked as

8    Government Exhibit 119.   Take a look at Government

9    Exhibit 119 as I describe it for the record.   Government

10   Exhibit 119 is Bates numbered SEC-GRANGER-E-0003629 all

11   the way to 3631.   It appears to be an e-mail chain that

12   involves you.   The top of the chain does not, which is

13   the one that appears to be from Andy Walter to Pound

14   Operations.   But right below that on the first page there

15   is an e-mail from you to Andy Walter looking at page

16   3629.

17               (SEC Exhibit No. 119 was marked

18               for identification.)

19           THE WITNESS:   My first page is 5419?

20           MR. BLAU:   Yeah.

21           MS. OCHOA:   Let me see.   Okay.   So let me go

22   ahead -- so the Bates number is SEC-GRANGER-E.

23           THE WITNESS:   Right.

24           MS. OCHOA:   00045419 all the way to 5421.

25           THE WITNESS:   Okay.

EXHIBIT 4 PAGE 159

Page 278

```
 1              BY MS. OCHOA:
 2         Q     And this chain involves -- the top of the
 3   e-mail is from you to Gerri and Andy.   Actually, from
 4   Andy to you copying Gerry McManus?
 5         A     Yes.
 6         Q     Okay.   Do you recognize Exhibit 119, which is
 7   Bates numbered SEC-GRANGER-E0005419 through 5421?
 8         A     They look like multiple e-mails by and
 9   between --
10         Q     Yes.   It's an e-mail chain, yes?
11         A     Right.
12         Q     And you're involved in every single one of
13   Exhibit 119?
14         A     Yeah, I'm either from or to.
15         Q     Right.   So do you recognize this chain?
16         A     I recognize this because it's right in front of
17   me.
18         Q     So you don't remember having received these
19   e-mails?
20         A     I don't remember specifically receiving it, but
21   I couldn't say I didn't receive it because I did.
22         Q     Okay.
23         A     Presuming that the headers are correct and the
24   sent to and the receive from are correct.
25         Q     Okay.   And your e-mail is Ralph
```

EXHIBIT 4 PAGE 160

Page 279

1    essexcapitalcorp.com; right?

2        A    Yes.

3        Q    Okay.  Let's turn to the second page of

4    Government Exhibit 119.  This is ending in 5420.  There's

5    an e-mail from Andy Walter to you, and it says, "Ralph,

6    thank you for processing the legal fees yesterday.  Very

7    much appreciated.  With respect to our second entity, we

8    are finalizing our internal investment memo to Granger

9    clients and wanted to confirm, Essex will be investing

10   1:1, so one to one, alongside us in this entity as well."

11            And then your response is, "Andy, as always, we

12   are 50-50 on each transaction."

13            Okay.  So tell me what do you mean by we are

14   50-50 --

15        A    It was a $2 million lease on Essex, and we used

16   this as a funding source.  They would put in a million

17   dollars and Essex would put in a million dollars.

18        Q    Did you guys do that --

19        A    We attempted to do that on every lease.

20        Q    But did you?

21        A    No.

22        Q    Did you do that on the leases that were part

23   of -- that were part of the Essex Granger 1 portfolio?

24        A    We attempted to do that.

25        Q    But you didn't?

EXHIBIT 4 PAGE 161