**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**Western Division**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>　　　　Plaintiff,<br><br>　　vs.<br><br>RALPH T. IANNELLI and ESSEX CAPITAL CORPORATION,<br><br>　　　　Defendants. | Case No. 2:18-cv-05008-FMO-AFM<br><br>**REPORT OF PRELIMINARY ACCOUNTING OF DEFENDANT ESSEX CAPITAL CORPORATION AND RECOMMENDATIONS OF COURT-APPOINTED MONITOR GEOFF WINKLER** |

## I.　　INTRODUCTION

Geoff Winkler (the "Monitor"), in his capacity as Monitor pursuant to the Order Regarding Preliminary Injunction dated October 1, 2018 (the "Order"), Dkt. No. 53, hereby submits this Report of Preliminary Accounting of Defendant Essex Capital Corporation and Recommendations (the "Report") summarizing his preliminary accounting of the assets and liabilities of Defendant Essex Capital Corporation and its subsidiaries and affiliates (collectively, "Essex") and making recommendations for next steps.

Pursuant to paragraph IX of the Order, the Monitor was empowered and tasked with the following:

- To have full, complete and immediate access to the books and records;

- To have full, complete, and immediate access to the principals, managers, directors, employees, agents and consultants of Defendants;
- To monitor and oversee the activities of Essex, including the review and, if proper, the approval of payment or transfer of certain transactions provided for in paragraph IV, sections A-F as applicable;
- To conduct such investigations as may be necessary to locate and account for all assets and liabilities of Essex;
- To choose, engage and employ attorneys, accountants, appraisers, and other independent contractors and technical specialists as the monitor deems advisable or necessary; and
- To submit to the Court, within forty-five days of obtaining the records set forth in the Order, with copies to Plaintiff, Defendants, and the Intervenors, a written report containing a preliminary accounting for Essex for the limited purpose of determining the assets and liabilities of Essex, and a recommendation as to whether the monitorship should be converted to a permanent receivership, whether the monitorship should continue or be expanded, or whether the monitorship should be limited or terminated.

The Monitor and his team, despite certain unsatisfied records requests, have reviewed information sufficient to prepare this report and believe that additional delay in filing this report may cause further harm to interested parties. The Monitor finds that the missing records materially limit some observations and conclusions included in the Report, and as such the observations and conclusions contained herein should be treated as preliminary until a complete and full accounting and investigation have been completed.

After the entry of the Order, the parties petitioned the Court for an Order Regarding Stipulation [56] Transaction (the "Jefferies Order"), which was entered on October 22, 2018. The Jefferies Order allowed the Monitor and Defendant Ralph T. Iannelli ("Iannelli")(collectively with Essex, "Defendants"), with the

approval of both parties, the discretion to determine whether to reduce or eliminate the Jefferies margin loan call and under what terms.

Since entry of the two orders, the Monitor has undertaken several tasks, including meeting with Iannelli, Essex's staff, investors, secured lenders and other interested parties. All parties, including Iannelli, have been cordial and cooperative. The Monitor visited the Essex office to review the records available and visually inspected several properties that are within the scope of the Order. Additionally, the Monitor has met with the office landlord regarding past-due rent and its recently filed lawsuit seeking eviction of Essex, and with Jefferies Financial Group and Pershing LLC regarding the outstanding margin loan call. Finally, the Monitor has undertaken several other tasks required by, or ancillary to, the duties laid out in the Order.

Please note that for the purposes of the Report we use the term investor to describe any individual, corporation or partnership that has provided funding to Essex other than secured lenders. Essex has previously used the terms investor, lender, and/or partner to describe what is referred to as an investor in the Report. Additionally, the Monitor has made the decision to redact or withhold the name of certain customers and investors to minimize any unintended harm it may cause. Specific names will only be used when necessary to inform the Court.

## II.  OVERVIEW OF BUSINESS OPERATIONS

Essex was founded in 1996 by Iannelli with the purpose, according to Essex's website, to "act as a financing source and lessor to credit worthy companies on a nationwide basis, leasing all assets except vehicles and commercial aircraft." While initially described as an equipment finance company, Essex also operationally funded other private equity investments.

Typically, once Essex identified a customer seeking financing, the equipment leases or bridge loans would fund through two sources: bank loans through traditional

and non-traditional financial institutions and promissory notes with individual investors (either in their name personally or through a legal entity).

The interest rate paid on the bank loans typically averaged 5.5%, while the interest rate paid to investors averaged 8% on 24-36 month[1] notes. These rates often varied, even between investments for a single investor, depending on the amount of investment, term of the note and other factors. Investors could usually choose from one of three repayment options: interest only payments ("IO"), principal and interest payments ("P&I"), and deferred principal and interest payments ("DP&I").

It is important to note that, while this was the way the investment program was intended to work, Defendants often deviated from the repayment options. In fact, it was less the exception than the rule that investors opting for IO or DP&I would continue to receive interest payments for many years in exchange for deferring repayment of their principal investment. Three examples of this practice and the resulting impact on Essex's operations have been attached to this Report as Exhibit A.

The customer/lessee side of the lease transaction is usually made up of the lease value amount plus interest amortized over its term, its residual value and, in some instances, warrants. The recurring payment amount is based on the amount borrowed, the term of the lease, and the interest rate charged. According to Iannelli, most of Essex's leases were for 24-36 months and generally carried an interest rate of 9.75%-10.25%. However, if you include the residual payment, the effective interest rate is 13%-15%.

The leases offered by Essex were operating leases, meaning that Essex continued to own the equipment until all lease payments were made and the customer opted to pay the residual value, which was agreed upon at the inception of the lease and is based on fair market value at the end of the leasing period, generally 10% of

---

[1] This is the typical term, but a few notes were either shorter or longer terms.

the total original loan amount. If a customer pays the residual value, then the equipment ownership is transferred to them. Alternatively, they have the option of returning the equipment in lieu of paying the residual value and Essex would then resell the equipment.

In addition to the interest earned, some loans and leases provided Essex with the opportunity to purchase stock in the underlying customer's company through the issuance of warrants. These warrants would allow Essex to buy an agreed upon number of shares at a set price for a defined period.

While most of these leases performed as expected, there were three lessees that filed bankruptcy over the last four years, representing an $11.3 million loss to Essex. The Defendants continued to make the bank loan and investor payments related to these leases despite not receiving the accompanying lease payments themselves. While not the primary reason for the financial distress faced by Defendants, these bankruptcies were a precipitating factor of the insolvency.

According to Iannelli, Essex has participated in approximately 120 lease transactions with an estimated value of $120,000,000. Due to the lack of records prior to 2007, the Monitor was unable to confirm these figures, although a cached version of Essex's website from 2010 boasted "…Essex has provided funding in excess of one billion dollars for those corporations."

As mentioned above, Essex occasionally offered private equity bridge loans to the customers they leased equipment to, ranging between $350,000-$800,000 for a total of $1.9 million. Unfortunately, of the three bridge loans made, only $346,538 (18%) has been collected to date and Defendants do not anticipate collecting more than $600,000 (32%) of the total due to insolvency and other financial issues on the client-side.

Essex also made several other private equity investments through loans and/or purchases across a variety of industries, including a pet store, a lumber yard, a test preparation company, commercial and residential real estate, technology, high tech

medical, and venture capital, to name a few. Most of these investments have either lost money, are long-term investments with dubious repayment prospects, or have failed to produce a profit.

Essex typically operated with a small staff of two or three employees and/or consultants in addition to Iannelli. This usually included a bookkeeper, who was paid a modest salary, and a sales person, who was paid a generous salary and was entitled to 20% of any residual and warrant income earned, net of investor payments and Essex fixed costs. Essex also employed a consultant with the title of "Chief Financial Officer" from March 2015 until August 2018 for about $206,000 per year. Iannelli was not paid a salary, but instead took significant annual bonuses and shareholder loans/distributions[2] from Essex. These bonuses and shareholder distributions are discussed in greater detail in Section III, paragraph C-4, below.

The Monitor believes that, if they had been managed and operated properly, the underlying equipment leasing business would be profitable. Unfortunately, that was not the case with Essex.

## III.   INTERIM ACCOUNTING OF ASSETS AND LIABILITIES

### A.   Description of the Financing and Accounting

The Monitor has not reviewed accounting records during the period from Essex's inception in 1996 until the company's QuickBooks file begins on 12/31/2006. On 12/31/2006, Essex had: total assets of $9,191,520, total loans and investor proceeds of around $12,664,740, and an implied negative equity position of $3,473,220. It appears Essex has been in financial straits since the beginning of the company's own records.

---

[2] The vast majority of the funds Iannelli took from Essex are likely to be classified as distributions under Internal Revenue Service rules. Otherwise, the collectability of these shareholder loans is in question. These transactions will be referred to as shareholder distributions in subsequent references in the Report.

From February 2007 through June 2017, Essex booked $75,000,697 in leased equipment fixed asset purchases. 77% of these fixed assets were acquired using $57,569,626 in secured and cross-collateralized loan proceeds from Montecito Bank and Trust ("MBT") and other banks. 23% of these fixed assets ($17,431,070) were therefore funded with investor proceeds, which totaled $140,277,169 during this period.

From 2007 through now, Essex's books reflect $37,592,491 in payments for investments in partnerships, private equity investments, bridge loans to lessees, and other non-lease assets. These assets yielded returns of $25,547,016 and have a residual balance sheet value of $4,502,750, leaving an estimated operational loss due to these investments of at least $7,542,725.  Since Essex does not appear to have ever been operationally profitable and no bank loans were used to finance these assets, these assets must have been entirely financed by Essex's investors.

The $85,253,608 balance of the investor proceeds appear to have been used as funding to cover operational expenses, including payroll and loan payments to Iannelli, and to help provide the paydown of at least $111,426,501 in principal and interest payments to other investors and secured lenders. Given this, it is unlikely that more than a quarter of investor funds were used to pay for any leased equipment, let alone specific leases, and were instead used as part of a common enterprise. To help illustrate, below is an example of an actual lease.

Over the past ten years, Essex's assets on its balance sheet incorrectly inflated the value of the lease assets and certain major investments. But it is clear that, from at least the point of the Passaic Healthcare Services insolvency, that had Essex ceased accepting new capital investments, an underlying cash insolvency would emerge very quickly and assure the actual insolvency of the company in short order.

Essex borrowed at least $10,220,754 from MBT in the form of cross-collateralized secured loans to purchase the Passaic equipment. Essex also raised at least $2,695,000 from investors for Passaic equipment, for a total of about

$12,915,754. In all, $8,062,445 of equipment purchases for Passaic from June 2011 through February 2014 were identified in Essex's records and it is unknown what the $4,853,309 of additional capital raised was spent on.

Passaic Healthcare Services filed for bankruptcy protection in December 2014, which escalated and deepened Essex's insolvency and resulted in the need to raise additional capital to meet the underlying obligations. Between June 2011 and its last payment in November 2014, Passaic paid Essex about $4,307,948 in lease payments. At the time of Passaic's insolvency, Essex was still obligated to pay the cross-collateralized MBT loans and still owed multiple years of interest to the project's investors although the underlying asset they had invested in was no longer there. Essex paid MBT about $11,830,552 in principal and interest.

One of the investors was able to extract their $1,995,000 investment in September 2014. The other two investors who invested in July 2013 would never receive their principal back but would continue to "roll over" their investments and receive interest payments totaling $474,517. In summary, Essex has operationally lost at least $9,992,121 on the Passaic leases and still owes investors principal and accrued interest in excess of $700,000. The only source Essex would have to pay that $10,692,121 would be from other investors since Essex never appears to have been operationally profitable and bank loan proceeds were lease-specific.

In total, Essex currently owes investors more than $68,797,842 in principal and accrued interest, however Essex only expects to generate $4,500,243 from its current leased assets and about $4,502,750 from its private equity investments. The $9,002,993 total anticipated revenue only represents about 13% of the amount currently owed to the investors.

### B.     Monitor's General Observations Regarding the Accounting

The Monitor reviewed 140 "promissory notes" from investors with face values totaling $90,656,355 and carrying an average interest rate of around 8% and terms that averaged 24-36 months. The average promissory note extended its terms and

paid interest 17 months beyond its contract and, as a result, Essex paid at least $11,149,892 in additional interest over those accumulated 2,250 additional months. Furthermore, there is no evidence to suggest that the underlying rollover capital was ever reinvested in equipment purchases or private equity loans, so this additional interest was most likely paid from other investors since Essex was never operationally profitable.

Essex has employed at least three bookkeepers since 2012 and three accounting firms to manage its tax responsibilities. The most recent CPA firm retained is Damitz, Brooks, Nightingale, Turner & Morrisset (the "CPA"). Based on our interviews, there appears to be a general lack of communication and coordination among Iannelli, his bookkeeper, and the CPA and, as such, no party appears to have assumed the responsibility of maintaining accurate and useful books and records for Essex. Based on the Monitor's review, Essex has not properly accounted for: accrued interest payable, long/short term assets/liabilities, fixed assets, lease payables/receivables, margin loans, and numerous income statement items. Due to Essex's apparent lack of finance and accounting management, the books and records that were produced, which lenders and investors relied upon, were chronically misstated. This necessitated extensive restatement of the 2015 and 2016 financials surrounding overstated assets and understated liabilities.

Essex's accounting records start ten years after the company's founding on 12/31/2006 with beginning journal entries and business activity appearing to commence on 1/2/2007. There are 45 journal entries credited to investors on 12/31/2006. These potential claimants' original investments cannot be confirmed and would have to be verified with contemporaneous banking documents or other proof of investment. The Monitor has not been provided any loans or promissory notes from before 2007 to review, nor does he have any insight into Essex's investments and payments made before 2007 other than the journal entries made 12/31/2006.

### C.   Monitor's Specific Observations Regarding the Accounting

####   1.   Review of the Assets

Exhibit B presents the Monitor's simplified balance sheet of Essex as of November 26, 2018. Essex's identified assets currently total $14,998,360. These assets are principally comprised of:

> - 36% potential future recovery from lawsuits and claims related to the Beamreach/Solexel and Passaic Healthcare Services insolvencies;
>
> - 30% estimated residual and/or liquidation value of certain private capital investments;
>
> - 17% expected future net sale value of currently-leased assets to be purchased by the current lessee;
>
> - 13% in equipment lease payment receivables net of MBT loans due between now and early 2021; and
>
> - 4% in checking accounts and net liquid marketable securities.

The current total assets of Essex as represented in the company's QuickBooks accounting file are overstated by at least $23,703,800. This is principally due to an 83% overstatement of the value of the leased fixed assets by at least $22,561,278. Essex's books and records have capitalized fixed assets in excess of $10,000,000 annually since 2010 but have never adequately recorded fixed asset depreciation or asset dispositions.

An analysis of the 2017 Depreciation and Amortization Report in Essex's completed 2017 Federal Tax Returns found that 37% of the assets listed with a year-end value had actually been disposed of before 12/31/2017. The Defendant suggested that the Monitor contact the CPA to ask them to explain the continued presence of the assets on Essex's 2017 Depreciation and Amortization Report. To that question, Monico Casillas, from the CPA, replied, "because nobody informed me that they were gone. We will take them off for 2018." Additionally, there are 17 other equity

investment assets on the balance sheet totaling $6,276,292 that have either been transferred away but not booked or are worthless but not written down.

### 2.     Review of the Liabilities and Equity

Essex's current balance sheet reports $67,317,294 in liabilities after making adjusting journal entries for the 2017 tax returns, and the Monitor has estimated the actual amount of Essex liabilities to be at least $68,951,070. Essex has nominal ongoing operating expenses; however, it owes more than $150,000 in past-due rent to the landlord of the Montecito office building, bringing total current accounts payable to around $153,228. The books also reflect accrued interest payable of $1,227,335. This figure is understated and the actual amount of accrued interest currently due to promissory note holders, business partners and investors, is at least $3,862,226. Essex's tax liabilities, if any, are currently unknown.

Essex's loans from MBT are all tied to the payout of the leases and are reflected in the asset totals in the paragraph above. The remaining $64,935,616 in liabilities are the sum of principal amounts payable to Essex's business partners and investors.

Investors signed promissory notes with Essex with face values from $25,000 to $9,760,000, interest rates from 2.5% to 10.0%, terms ranging from one month to six years and some with no finite term at all. The notes also reflected three principal payment types: interest only payments ("IO"), principal and interest payments ("P&I"), and deferred principal and interest payments ("DP&I").

There are also several partnerships ("Partners") with unique qualities. Although they represented only 6% of the money invested into Essex, Partners represent 11% of the overall net liabilities payable. On average, Partners are still owed at least 44% of their initial investment when recategorizing interest payments as return of principal.

IO investors represent about 56% of the investors in Essex and are owed about 33% of their initial investment when recategorizing interest payments as return of

principal, representing 73% of net liabilities payable. P&I and DP&I investors have made out generally better and are only owed about 11% of their initial investment when recategorizing interest payments as return of principal; they collectively represent 38% of Essex's investors and 16% of the overall net liabilities payable.

From 2007-2018, Iannelli has paid himself bonuses and shareholder distributions from Essex totaling $19,083,388. Accordingly, the accumulated Net Income and Retained Earnings for Essex is negative $73,036,097 for a total negative equity position of $53,952,710.

### 3. Insolvency

Based on the analysis of the financial condition of Essex described above, there is serious doubt as to the ongoing viability of Essex. Although the Monitor believes that Essex has essentially been insolvent for many years, it would be expensive, time consuming, and unnecessary given the current financial condition to restate financials before 2014.

### a. Essex's Records

Essex's own consolidated financial statements from 2014 through 2017, described below, show continued, growing, and overwhelming insolvency.

2014: Essex lost $2.1 million, which, when added to the $3.17 million deficit from previous years, creates a total shareholder deficit of $5.3 million.

2015: Essex lost $10.49 million, which, when added to the $5.3 million deficit from previous years, creates a total shareholder deficit of $15.79[3] million.

2016: Essex lost $22.8 million, which, when added to the $15.79[3] million deficit from previous years, creates a total shareholder deficit of $38.6 million.

2017: The Monitor is unable to accurately determine total loss in 2017 as the accountants have declined to provide consolidated financial statements given the issues described above.

---

[3] Restated shareholder deficit.

2018: The Monitor's restated balance sheet, attached as Exhibit B, estimates that the total shareholder deficit as of November 26, 2018 is $53.95 million.

The Monitor believes that the 2014-2016 shareholder deficit presented above are understated due to the issues described in Section III, paragraphs B and C above (Monitor's General and Specific Observations Regarding the Accounting).

The Monitor is not alone in his concern about the viability of Essex. Note 17 from 2015 consolidated financials from Essex's CPA states:

> "[a]s shown in the accompanying financial statements, the Company incurred a net loss of approximately $7,042,213during the year ended December 31, 2015, and as of that date, the Company's current liabilities exceeded its current assets by approximately $21,984,000 and its total liabilities exceeded its total assets by approximately $12,362,000. **Those factors create a substantial doubt about the Company's ability to continue as a going concern for the year following the date the financial statements are available to be issued.**" (emphasis added)

The 2016 consolidated financial statements carried a similar note, but the total liabilities exceeded the total assets by approximately $38.6mm.

### b.    Lack of Working Capital

Currently, Essex has approximately $454,419 left in its bank accounts. The prospect of Defendants obtaining any third-party financing are remote given the Defendants' current financial condition, Iannelli's inability to raise funds due to his being barred from the securities industry[4] and the ongoing Securities and Exchange Commission litigation.

Furthermore, Iannelli has represented that he does not personally have significant capital to infuse in Essex. Without additional funding, Defendants have

---

[4] In August 1974, Iannelli was enjoined from offering securities after committing violations of the antifraud provision of the securities laws. In March 1976, Iannelli was found in criminal contempt for violating the previous court order by manipulating stock prices.

current working capital of about $595,367 and will generate about $250,013 of combined net leasing income and residual equipment value realized per month over the next eighteen months. If the Defendants were to only pay the monthly interest on the investors' notes, ignoring the $3,862,226 in accrued interest currently due, they would have to pay $437,071 in interest payments per month. At this rate, Defendants have less than two months of cash reserves remaining. Even if Defendants were to temporarily suspend interest payments to investors, it does not appear that Defendants have enough working capital to successfully purchase additional equipment to increase the funds available to repay investors.

### c.   Solvency Analysis

Based upon the Monitor's findings and observations to date, Essex appears to be insolvent. Solvency is nearly universally defined as, "... a company's ability to meet the interest costs and repayment schedules associated with its long-term debt obligations."[5]

Specifically, the State of California states, "A debtor is insolvent if, at a fair valuation, the sum of the debtor's debts is greater than the sum of the debtor's assets."[6]

Solvency analysis is applied by testing the three following categories:[7]

  - *Balance Sheet Test* - Used to determine whether, at the time of the transaction, a company's asset value (valued as a going concern) was greater than its liability value.

---

[5] Anthony, Robert N., Management Accounting: Text and Cases, (Richard D. Irwin, Homewood, IL-1964), page 301.
[6] California Civil Code 3439.02 – (a)
[7] Reilly, Robert F., and Schweihs, Robert P., The Handbook of Advanced Business Valuation, (McGraw-Hill Irwin, New York 2000), page 340-342.

- ***Cash Flow Test*** - Used to determine whether a business entity incurred debts that would be beyond the debtor's ability to pay as such debts matured.

- ***Adequate (Reasonable) Capital Test*** - Used to determine if an entity was engaged in a business or a transaction for which it had unreasonably small capital.[8]

### d.    Balance Sheet Test

The Balance Sheet Test is used to determine whether, at the time of the investigation, a company's asset value (valued as a going concern) was greater than its liability value.

As previously discussed in this report, Essex's primary liability is the amount due to investors. According to Essex's internal accounting, the current amount owed to investors is approximately $68.8 million, which includes any accrued interest owed to investors. The estimated fair market value of all known Essex assets is a small fraction of the liabilities owed. As such, Essex fails the Balance Sheet Test.

### e.    Cash Flow Test

The Cash Flow Test is used to determine whether a business entity incurred debts that would be beyond the debtor's ability to pay as such debts matured. As discussed above and based upon on the analysis provided, it appears that Essex is unable to generate sufficient cash flow to continue as a going concern and, consequently, is unable to repay its debt requirements as they mature. Compounding the issue, as investors continue accruing interest under the program terms, the value of active loan accounts will increase exponentially. As such, Essex fails the Cash Flow Test.

---

[8] Dorrell, Darrell D. and Gadawski, Gregory A. "Valuation in Solvency Analysis," National Litigation Consultants' Review, (Litigation Consultants, LLC - Vol. 3 Issue 2, July 2003).

### f.     Adequate (Reasonable) Capital Test

The Adequate Capital Test is used to determine if an entity was engaged in a business for which it had unreasonably small capital. The Adequate Capital Test is related to the Cash Flow Test in that if a company has adequate capital, it will be able to pay its debts as they come due and will have the capital to run its business under a wide range of financial circumstances and economic conditions. The Adequate Capital Test is intended to determine whether a company is likely to survive, assuming reasonable business fluctuations in the future, based upon a substantive business plan.

As previously discussed, it is apparent that Essex does not possess adequate capital to survive the near term, much less continue as a going concern. As such, Essex fails the Adequate Capital Test.

### 4.     Salaries, Bonuses, and Shareholder Distributions (2014-2018)

As discussed in Section II above, Iannelli did not draw a salary from Essex. Iannelli did, however, pay himself significant bonuses over the last four years[9] and totaled $2,063,614 despite Essex losing millions and suffering from cash shortfalls during this same period. The bonuses for each year are detailed below.

| Year | Bonus Paid | Shareholder Deficit (in millions) |
|------|-----------|-----------------------------------|
| 2014 | $508,465 | $5.3 |
| 2015 | $505,149 | $15.79[10] |
| 2016 | $700,000 | $38.6 |
| 2017 | $350,000 | $48.6[11] |

---

[9] Iannelli's bonuses are not calculated until after the CPA has prepared the previous year's tax returns and entered all necessary adjusting journal entries. Therefore, no 2018 bonus has been established.

[10] Restated shareholder deficit.

[11] Estimated due to the unavailability of a 2017 consolidated financial report.

During this same period of insolvency, Iannelli took at least $12,235,244 in shareholder distributions. The shareholder distributions for each year are detailed below.

| Year | Shareholder Distributions | Shareholder Deficit (in millions) |
|------|---------------------------|-----------------------------------|
| 2014 | $1,634,500 | $5.3 |
| 2015 | $4,458,979 | $15.79[12] |
| 2016 | $4,131,219 | $38.6 |
| 2017 | $1,490,825 | $48.6[13] |
| 2018 | $519,721 | $53.95[14] |

The total amount that Iannelli has paid himself in bonuses and shareholder distributions since 2006 is at least $19,083,388.

### 5.      Preferential Payments

Since the Securities and Exchange Commission notified Defendants of its investigation in March 2017, Defendants have made multiple payments and transfers that were intended to benefit a small, select group of "insider" investors. Many of these transactions, a few of which are described below, are likely to be considered preferential transfers.[15]

---

[12] Id.
[13] Id.
[14] From the Monitor's simplified balance sheet as of 11/26/2018 (Exhibit C).
[15] 11 U.S.C. § 547(b) defines a preferential transfer as a payment: (1) to or for the benefit of the creditor, (2) for or on account for an antecedent debt owed by the customer before the payment was made, (3) made while the customer was insolvent, (4) made on or within 90 days (1 year for insiders) before the date of the Bankruptcy Petition, and (5) that such payment enabled the creditor to receive more than it would receive if there was a liquidation of the debtor's bankruptcy estate under Chapter 7 of Bankruptcy Code.

- In April 2018, Defendants transferred over $5 million in private equity investments to one insider investor, G. Grant, who Defendants have done substantial business with both inside and outside of the normal investments offered to investors.

- In May 2018, Iannelli allowed another insider investor, J. Perry, to place a $3 million lien on his primary residence in Santa Barbara, CA. Defendants and this investor have been business partners and shared office space for many years.

- For this final example, Defendants made three separate preferential transfers to yet another insider investor, P. Wolansky,[16] that are detailed below.

    - In June 2018, Iannelli sold $2 million interest in his apartment in New York, NY.

    - In August 2018, Defendants assigned interest in four performing leases that weren't subject to MBT security interest worth $932,551.90 in lease payments and $244,241.06 in estimated residual value.

    - In September 2018, Defendants transferred 83,333 shares of Neos Therapeutics stock to a transfer agent to hold as additional security. The insider investor is entitled to as much as $9.60 per share with anything above that going back to Essex.[17]

While these examples are far from the only preferential transfers identified by the Monitor, they are likely the most egregious. It is likely that any plan for

---

[16] P. Wolansky also invested through TGFJ and TGFJ II.

[17] As of the date of this report, Neos Therapeutics is currently trading at less than 18 percent of this value.

repayment of all investors would include a strategy to unwind these preferential transfers, which totaled over $11.6 million.

### 6.    Ponzi-Like Scheme Indicia

During the Monitor's investigation and fulfillment of duties as set forth in the Order, the Monitor has encountered indicia of a Ponzi-Like Scheme defined as follows:

A Ponzi-like scheme is generally defined as an illegal business practice in which new investors' money is used to make payments to earlier investors. Unlike a traditional Ponzi scheme,[18] which is a simple investment scam that rakes in as much money as possible and then disappears, a Ponzi-like scheme usually occurs within a legitimate operating business that, due to financial pressures, continues to take investors' money to pay off the investments of previous investors.

In accounting terms, money paid to Ponzi investors, described as income, is actually a distribution of capital. Instead of sharing profits, the company is sharing cash reserves.[19]

The various Ponzi-like scheme indicia encountered during the fulfillment of Monitor's duties include, but are not limited to, the following:

- Initial investors are paid with subsequent investors' money –

Defendants have represented that all principal and interest payments are

---

[18] Ponzi Schemes - A type of illegal pyramid scheme named for Charles Ponzi, who duped thousands of New England residents into investing in a postage stamp speculation scheme back in the 1920s. Ponzi thought he could take advantage of differences between U.S. and foreign currencies used to buy and sell international mail coupons. Ponzi told investors that he could provide a 40% return in just 90 days compared with 5% for bank savings accounts. Ponzi was deluged with funds from investors, taking in $1 million during one three-hour period in 1921. Though a few early investors were paid off to make the scheme look legitimate, an investigation found that Ponzi had only purchased about $30 worth of international mail coupons.

[19] Fraud Examiners Manual. (ACFE - 2017). P. 1.1336.

paid from profits from equipment leases. However, a review of the accounting records shows numerous instances of older investors being paid from funds provided by new investors.

For example, two investors signed promissory notes for $100,000 and $600,000 in July 2013 specifically for use in purchasing Passaic lease equipment. However, Passaic stopped paying Essex in November of 2014 before declaring bankruptcy in December 2014 and, as noted above, Essex suffered a loss in excess of $10.7 million. Despite no longer having a revenue-generating asset, Essex would go on to pay an additional 25 months of interest (about $17,187) on the $100,000 note and 39 months of interest on the $600,000 note (about $160,875). Since Essex doesn't appear to have ever generated an operating profit, these interest payments were likely made with the only other source of cash Essex had – subsequent investors' money.

A review of the accounting records reveals that almost $38 million has been invested in other non-lease assets, yet the business has suffered over $22 million in losses and another $12 million in transfers away during this period, for a net current value of investments of about $4.5 million.

- Masquerading as some type of investment - The investments offered by Essex have been advertised as a loan program "secured and backed by actual equipment leases."

- Abnormally high returns - As illustrated above, investment return rates averaged 2.5 percent higher than traditional bank financing and allowed investor to continue to earn interest, even after the underlying lease has ended, despite no new equipment purchase to fund the additional interest payments.

- Payoffs made from the pool of investor funds while the remainder is used for the operators' personal gain - Due to the comingling of funds and the lack of historical financial records, it is difficult to determine the ultimate use of Essex's funds. Nevertheless, Iannelli has taken nearly $20 million from Essex despite significant losses and cash flow shortages.

### D.    Conclusions Related to Accounting

The financial state of Essex is dire and likely terminal. Dire in that it has liabilities due or nearly due of at least $73.4 million and terminal in that there is only enough future revenue and current and long-term assets to cover about 22% of those liabilities. The overstatement of Essex's assets allowed it to secure additional loans, which it may not have otherwise been able to secure, and to pay contemporaneous liabilities for at least four additional years. Essex's leased assets and private equity value were also inflated, leading anyone who reviewed its financials to believe the company had significant positive equity.

Eight of the twelve years of Essex's financial records show an average of negative $12.5M in equity and, for the four years that are positive, those figures appear to be largely due to the overstated value of private equity investments (e.g. Revance, Neos), which were later restated by the CPA.

Essex had three sources of cash: operations, which appear to have never been profitable; MBT, which exclusively financed lease equipment, and investors. Of the cash provided by investors, 12.4% funded leases, 26.8% funded private capital investments and 60.8% went to other expenses. Since it appears that Essex was never profitable, Essex could not have contributed to these expenditures.

These other expenses are monies paid to or loaned by Iannelli, general operating expenses of Essex, and principal and interest payments to secured lenders and investors. These funds do not appear to have been used to purchase equipment as promised. If not for the unrealized gains due to the drastically inflated value of

certain security assets propping up the balance sheet and new investor money coming in, Essex would have been operationally insolvent since at least January 1, 2013.

## IV.  **RECOMMENDATIONS**

For all the reasons described above, the Monitor recommends the Court take the following actions:

1.  The Monitor recommends that the Court appoint a receiver to protect the interests of all investors. Given the urgent and dire situation outlined in this Report, the Monitor has attached as Exhibit C, a Proposed Order Regarding Preliminary Injunction and Appointment of a Permanent Receiver (the "Proposed Order") and urges this Court to sign the Proposed Order immediately. The Monitor has conferred with the following interested parties to get their position on the Proposed Order:

- Counsel for Plaintiff and they do not object to the entry of the Proposed Order;
- Counsel for Defendants and he consents to the Proposed Order based on Defendants' view that the appointment of a receiver will help Essex's noteholders;[20]
- Counsel of record for the investors, Brian Miller, who the Court allowed to intervene in this matter on behalf of several investors for the limited purpose of being heard on the topics of any asset freeze and any Receivership/monitor over Defendant Essex,  stated that he is unable to express a position on the Proposed Order until after he had the opportunity to review my Report, but it was unclear to me whether Brian Miller still represents all of the investors the

---

[20] Mr. deNeve also stated the following in connection with his clients' consent to the Proposed Order: "Defendants were not provided an opportunity to review the Monitor's report prior to its submission to the Court and, therefore, Defendants' consent to the order should not be deemed as acceptance of any of the statements contained in the monitor's report.  Defendants further reserve their rights to respond to the report to address any inaccuracies, erroneous statements, or other matters in the report.  Further, to the extent that plaintiff proposes to rely on any statement in the report at any hearing or trial, Defendants reserve the right to object or present expert testimony or other evidence to rebut any such statement."

Court ordered be allowed to intervene on October 1, 2018, or if he only
continues to represent investors G. Grant and B. Wheatly; and

- Counsel for Granger Management LLC and Daniel Investment Associates,
  Michael Present and Greg Van Wyk, respectively, both stated that they support
  the Proposed Order, as evidenced by their letters attached to the Report as
  Exhibits D and E.[21]

2.      The Monitor recommends a full review of all payments and transfers of
Defendants' assets for evidence of preferential transfers and other potential causes of
action for the benefit of investors. This is of particular concern to the Monitor due to
the number and size of transactions with insiders.

3.      The Monitor recommends gathering any missing documents to further
investigate known and unknown assets of Defendants for the benefit of investors. The
Monitor's investigation has raised several questions regarding the potential for
additional asset recovery.

4.      The Monitor recommends a full review of all potential third-party claims
against culpable parties for the benefit of investors. Once established, these causes of
actions should be examined from a cost-benefit analysis perspective and presented to
the Court for approval prior to commencing.

5.      The Monitor recommends that a claims review process be established
whereby investors are notified and requested to provide verifiable information as to
the amounts invested and distributions that they received. This will provide an
expedient way to assess and verify the amounts received by Essex and, in part, where
Essex's money went.

6.      The Monitor recommends exploring the best method for maximizing
return to investors. This may include looking for opportunities to acquire additional

---

[21] Daniel Investment Associates served as the investment adviser for at least 11 of the
investors the Court allowed to intervene on in its October 1, 2018, who are ostensibly
still represented by Brian Miller.

equipment leases, continuing operations until all current leases are completed, or an orderly winddown and sale of Defendants' assets. The Monitor believes that whatever method is chosen, it should be done in consultation with the Court designed to provide the best possible returns while minimizing potential risk to investors. The Monitor also believes that Iannelli should continue to be utilized as an unpaid resource due to his historical knowledge relating to Defendants.

## V.   **CONCLUSION**

The Monitor appreciates the opportunity to submit this Report, which reflects his work as of November 26, 2018. The findings reflected in this Report are based on information that has been reviewed to date and are subject to clarification, expansion or change as more information becomes available.

Respectfully submitted this 6th day of December, 2018.


_____
Geoff Winkler, Monitor,
Essex Capital Corporation

# EXHIBIT A

Business Economics For

Three Investors Who Agreed

To Extend Their Promissory

Note Terms In Exchange

For Deferring Principal

Repayment

**EXHIBIT A**

**Business Economics For Three Investors Who Agreed To Extend Their Promissory Note Terms In Exchange For Deferring Principal Repayment**

| | Investor A | Investor B | Investor C | TOTAL |
|---|---|---|---|---|
| Principal Investment | 50,000 | 925,000 | 900,000 | 1,875,000 |
| Investment Date | Pre-2007 | 2007-2008 | 2009-2011 | |
| Investment Type | DP&I[1] | DP&I[1] | IO[2] | |
| Promissory Note Term (Months)[3] | Unk. | 3 | 3 | |
| Est. Actual Term of Note (Months)[4] | 144 | 120 | 95 | |
| Fully Repaid | Apr-17 | Jan-17 | N/A[5] | |
| Interest Paid | 78,080 | 705,000 | 596,105 | 1,379,185 |
| Principal Repaid | 50,000 | 925,000 | - | 975,000 |
| Effective Interest Rate Paid | 8%[6] | 9.0% | 8.4% | |
| | | | | |
| **Expected Economics of Investment** | | | | |
| Underlying Estimated Gross Lease Value to Essex[7] | 65,000 | 1,202,500 | 1,170,000 | 2,437,500 |
| Principal and Interest Repaid | 62,986 | 1,197,902 | 1,143,000 | 2,403,887 |
| **Essex Operating Revenue Generated[8]** | **2,014** | **4,598** | **27,000** | **33,613** |
| | | | | |
| **Actual Economics of Investment** | | | | |
| Underlying Estimated Gross Lease Value to Essex[7] | 65,000 | 1,202,500 | 1,170,000 | 2,437,500 |
| Principal and Interest Repaid or Currently Due | 128,080 | 1,630,000 | 1,496,105 | 3,254,185 |
| **Essex Operating Revenue Generated** | **(63,080)** | **(427,500)** | **(326,105)** | **(816,685)** |
| | | | | |
| Expected v. Actual Revenue Differential | **(65,094)** | **(432,098)** | **(353,105)** | **(850,297)** |

**Notes**

1: Deferred Principal and Interest Promissory Notes

2: Interest Only Promissory Notes

3: The Monitor is Unsure How the Economics of the Investment Scenario Would Pencil Out Given Two of the Investors Expected to be Paid Back After Three Months Despite the Underlying Equipment Lease Being on a 36-Month Term, Which Would Require Essex's Ability to Pay Investor's Principal and Interest While Simultaneously Paying Other Investor's Principal

4: Original Promissory Notes Not Reviewed; Payments Before 2007 Unknown

5: Investor's Principal Has Not Been Repaid

6: Interest Rate Inferred From Reverse Calculation; No Promissory Notes Reviewed

7: Estimations Based on Business Operations Described in Section II Paragraph 5

8: Under Ideal Operations, Essex Nets 1.4% of the Lease Value

# EXHIBIT B

Essex Capital Corporation

Simplified Balance Sheet

as of 11/26/2018

**EXHIBIT B**

## ESSEX CAPITAL CORPORATION
## SIMPLIFIED BALANCE SHEET
## 11/26/2018

| | |
|---|---:|
| **Assets** | |
| Net Liquid Assets | 595,367 |
| Lease Recievables Net of Bank Loans | 2,003,782 |
| Est. Residual Value of Leased Assets | 2,496,460 |
| Est. Value of Private Equity Investments[1] | 4,502,750 |
| Potential Value of Litigation[2] | 5,400,000 |
| **Total Assets** | **14,998,360** |
| | |
| **Liabilities** | |
| Operating Expenses Payable | 153,228 |
| Est. Accrued Interest Payable to Investors | 3,862,226 |
| Principal Payable to Investors | 64,935,616 |
| **Total Liabilities** | **68,951,070** |
| | |
| **Equity** | |
| 2007-2018 Owner's Payroll and Net Loans | 19,083,388 |
| Retained Earnings | (73,036,097) |
| **Total Equity** | **(53,952,710)** |

**Notes**
1: Valued at Cost or Reasonable Future Recovery Value
2: Probability of Successful Recovery is Unknown

# EXHIBIT C

[Proposed] Order

Regarding Preliminary

Injunction  and

Appointment of

a Permanent Receiver

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

## Western Division

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. 2:18-cv-05008-FMO-AFM |
| Plaintiff, | **[PROPOSED] ORDER REGARDING PRELIMINARY INJUNCTION AND APPOINTMENT OF A PERMANENT RECEIVER** |
| vs. | |
| RALPH T. IANNELLI and ESSEX CAPITAL CORPORATION, | |
| Defendants. | |

**EXHIBIT C**

The Court, having considered the forty-five day report prepared and submitted by the court appointed monitor, Geoff Winkler, on December 5, 2018, any response thereto, and the consent of Plaintiff the Securities and Exchange Commission, Defendant Essex Capital Corporation ("Essex"), and Defendant Ralph T. Iannelli to the entry of this proposed order, hereby finds that:

    A.    This Court has jurisdiction over the parties to, and the subject matter of, this action; and

    B.    Good cause exists to warrant the appointment of Geoff Winkler as a Receiver over Defendant Essex and its subsidiaries and affiliates.

## I.

IT IS HEREBY ORDERED that Defendants Essex and Iannelli (collectively, "Defendants"), and their officers, agents, servants, employees, attorneys, subsidiaries and affiliates, and those persons in active concert or participation with any of them, who receive actual notice of this Order, by personal service or otherwise, and each of them, shall remain preliminarily restrained and enjoined from, directly or indirectly, in the offer or sale of any securities, by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails:

    A.    employing any device, scheme or artifice to defraud;

    B.    obtaining money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

    C.    engaging in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser; in violation of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

## II.

IT IS FURTHER ORDERED that Defendants Essex and Iannelli, and their officers, agents, servants, employees, attorneys, subsidiaries and affiliates, and those

**EXHIBIT C**

persons in active concert or participation with any of them, who receive actual notice of this Order, by personal service or otherwise, and each of them, shall remain preliminarily restrained and enjoined from, directly or indirectly, in connection with the purchase or sale of any security, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange:

    A.    employing any device, scheme or artifice to defraud;

    B.    making any untrue statement of a material fact or omitting to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

    C.    engaging in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person;

    in violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

### III.

IT IS FURTHER ORDERED that, except as otherwise ordered by this Court, Defendants Essex and Iannelli, and their officers, agents, servants, employees, attorneys, subsidiaries and affiliate, and those persons in active concert with them, who receive actual notice of this Order, by personal service or otherwise, and each of them, shall remain preliminarily restrained and enjoined from:

    A. directly or indirectly, transferring, assigning, selling, hypothecating, changing, wasting, dissipating, converting, concealing, encumbering, or otherwise disposing of, in any manner, any funds, assets, securities, claims or other real or personal property, including any notes or deeds of trust or other interest in real property, wherever located, of any one of the Defendants or their subsidiaries or affiliates, owned by, controlled by, managed by or in the possession or custody of any of them; or

EXHIBIT C

B.  from transferring, encumbering dissipating, incurring charges or cash advances on any debit or credit card of the credit arrangement of Defendant Essex, or their subsidiaries and affiliates.

### IV.

IT IS FURTHER ORDERED that Paragraphs III and V shall not apply to the following transactions:

A.  any compensation or funds received by Defendant Iannelli after November 30, 2018, so long as it is in no way related to Essex Capital and its affiliates, or Defendant Iannelli's association or prior control of Essex Capital and its affiliates;

B.  social security payments to Defendant Iannelli; and

C.  subject to the Receiver's approval to lift the freeze on such deposits, any deposits, withdrawals, or payments from the following accounts at Montecito Bank & Trust ("MBT") and Merrill Lynch ("ML"):

   i.  Ralph T. Iannelli and Melissa R. Iannelli, MBT Acct. No. xxxxx3331;

   ii.  Ralph Iannelli Jr. Family Irrevocable Trust, MBT Acct. No. xxxxx8912;

   iii.  Ralph Iannelli Family Irrevocable Trust, MBT Acct. No. xxxxx8920;

   iv.  Iannelli Family Irrevocable Trust, MBT Acct. No. xxxxx8939;

   v.  Melissa R. Iannelli, ML Acct. No. xxxxx4225; or

   vi.  Melissa R. Iannelli, ML Acct. No. xxxxx8702.

### V.

IT IS FURTHER ORDERED that, except as provided in Paragraph IV of this Order or otherwise ordered by this Court, an immediate freeze shall be placed on all monies and assets in all accounts at any bank, financial institution or brokerage firm,

**EXHIBIT C**

or third-payment payment processor, all certificates of deposit, and other funds or assets, held in the name of, for the benefit of, or over which account authority is held by Defendants Essex and Iannelli, including but not limited to the accounts listed below:

| BANK NAME | ACCOUNT NAME | ACCOUNT NO. |
|---|---|---|
| E Trade | Ralph T. Iannelli & Melissa R. Iannelli | xxxxx9733 |
| E Trade | Ralph Thomas Iannelli | xxxxx4415 |
| First Republic Bank | White Bay Essex Leasing | xxxxx1137 |
| First Republic Bank | Cornerstone Essex Leasing Co. LLC | xxxxx1270 |
| First Republic Bank | Essex-Granger LLC | xxxxx1348 |
| First Republic Bank | 1486 East Valley Rd LLC | xxxxx2611 |
| First Republic Bank | Ralph T. Iannelli & Melissa R. Iannelli | xxxxx3593 |
| First Republic Bank | Essex-Granger II LLC | xxxxx7009 |
| First Republic Bank | Cornerstone Essex Leasing Co. II LLC | xxxxx8565 |
| First Republic Bank | Essex Capital Corporation | xxxxx8847 |
| First Republic Bank | Ralph T. Iannelli | xxxxx9049 |
| First Republic Bank | SIU Capital LLC | xxxxx9339 |
| First Republic Securities Company, LLC | Essex Capital Corporation | xxxxx3863 |
| First Republic Securities Company, LLC | Ram Capital Corporation | xxxxx6689 |
| Interactive Brokers | Ralph T. Iannelli & Melissa R. Iannelli | xxxxx8388 |
| Jefferies LLC | Essex Capital Corporation | xxxxx2718 |
| Jefferies LLC | Essex Capital Corporation | xxxxx4748 |
| Merrill Lynch | Essex Capital Corporation | xxxxx2764 |
| Merrill Lynch | BYSE LLC c/o Ralph Iannelli | xxxxx3521 |
| Merrill Lynch | SIU Capital LLC | xxxxx3593 |
| Merrill Lynch | KP Investment Partners | xxxxx3594 |
| Merrill Lynch | KF Leasing Partners LP | xxxxx3665 |
| Merrill Lynch | Ralph T. Iannelli | xxxxx4222 |
| Merrill Lynch | Ralph T. Iannelli & Melissa R. Iannelli | xxxxx4223 |
| Merrill Lynch | Ralph T. Iannelli | xxxxx4224 |

EXHIBIT C

| BANK NAME | ACCOUNT NAME | ACCOUNT NO. |
|---|---|---|
| Merrill Lynch | Melissa R. Iannelli | xxxxx4225 |
| Merrill Lynch | Ralph T. Iannelli and Melissa R. Iannelli | xxxxx4228 |
| Merrill Lynch | Melissa R. Iannelli | xxxxx8702 |
| Montecito Bank & Trust | KF Investment Partners LP | xxxxx1816 |
| Montecito Bank & Trust | Essex Capital Corporation | xxxxx3839 |
| Montecito Bank & Trust | Western Animal Supply LLC | xxxxx3959 |
| Montecito Bank & Trust | Essex Ocean LLC | xxxxx6982 |
| Montecito Bank & Trust | Essex Ocean LLC | xxxxx6990 |
| Montecito Bank & Trust | Essex-Granger LLC | xxxxx7276 |
| Montecito Bank & Trust | Essex-Granger II LLC | xxxxx7283 |
| Montecito Bank & Trust | Essex Capital Corporation | xxxxx7311 |
| Montecito Bank & Trust | 915 Elm Avenue CVL LLC | xxxxx8411 |
| Montecito Bank & Trust | Ralph Iannelli Jr. Family Irrevocable Trust | xxxxx8912 |
| Montecito Bank & Trust | Ralph Iannelli Family Irrevocable Trust | xxxxx8920 |
| Montecito Bank & Trust | Iannelli Family Irrevocable Trust | xxxxx8939 |
| UBS | Essex Capital Corporation | xxxxx70JM |
| Montecito Bank & Trust | KF Leasing Partners LP | xxxxx8947 |

Any bank, financial institution or brokerage firm, or third-party payment processor holding such monies and assets described above shall hold and retain within their control and prohibit the withdrawal, removal, transfer or other disposal of any such funds or other assets except as otherwise ordered by this Court.

**VI.**

IT IS FURTHER ORDERED that, except as otherwise ordered by this Court, an immediate freeze shall be placed on the title of the following properties, which shall not be mortgaged, transferred, or otherwise hypothecated:

| LISTED OWNER | ADDRESS |
|---|---|
| Ralph T. Iannelli | 266 Penny Lane, Santa Barbara, CA 93108 |
| Ralph T. Iannelli | 257 Central Park West, Apt. 4C, New York, NY 10024 |
| Ralph T. Iannelli | 915 Elm Avenue, Carpinteria, CA 93013 |

## VII.

IT IS FURTHER ORDERED that, within ten days from the date of this Order, Defendants, any bank, financial institution or brokerage firm, and each of them, shall transfer to the Receiver assets, funds and other property held in foreign locations in the name of any Defendant, or for the benefit or under the direct or indirect control of any of them, or over which any of them exercises control or signatory authority.

## VIII.

IT IS FURTHER ORDERED that Defendants, within five days of the issuance of this Order, shall, to the extent it has no previously been provided, prepare and deliver to the SEC a detailed and complete schedule of all of their personal assets, including all real and personal property exceeding $10,000 in value, and all bank, securities, and other accounts identified by institution, branch address and account number.  The accounting shall include a description of the sources of all such assets. Such accounting shall be delivered to the SEC to the attention of Gary Leung and Doug Miller, counsel for the SEC.  After completion of the accounting, each of the Defendants shall produce to the SEC at a time agreeable to the SEC, all books, records and other documents supporting or underlying their accounting.

## IX.

IT IS FURTHER ORDERED that any person who receives actual notice of this Order by personal service or otherwise, and who holds, possesses or controls assets exceeding $5,000 for the account or benefit of any one of the Defendants, shall within 5 days of receiving actual notice of this Order provide counsel for the SEC with a written statement identifying all such assets, the value of such assets, or best approximation thereof, and any account numbers or account names in which the assets are held.

## X.

IT IS FURTHER ORDERED that, except as otherwise ordered by this Court,

**EXHIBIT C**

each of the Defendants Essex and Iannelli, and their officers, agents, servants, employees, attorneys, subsidiaries and affiliates, and those persons in active concert or participation with any of them, who receive actual notice of this Order, by personal service or otherwise, and each of them, shall remain preliminarily restrained and enjoined from, directly or indirectly: destroying, mutilating, concealing, transferring, altering, or otherwise disposing of, in any manner, any documents, which includes all books, records, computer programs, computer files, computer printouts, contracts, emails, correspondence, memoranda, brochures, or any other documents of any kind in their possession, custody or control, however created, produced, or stored (manually, mechanically, electronically, or otherwise), pertaining in any manner to Defendant Essex.

## XI.

IT IS FURTHER ORDERED that Geoff Winkler is appointed as Receiver of Defendant Essex and its subsidiaries and affiliates, with full powers of an equity receiver, including, but not limited to, full power over all funds, assets, collateral, premises (whether owned, leased, occupied, or otherwise controlled), choses in action, books, records, papers and other property belonging to, being managed by or in the possession of or control of Defendant Essex and its subsidiaries and affiliates, and that such Receiver is immediately authorized, empowered and directed:

A.   to have access to and to collect and take custody, control, possession, and charge of all funds, assets, collateral, premises (whether owned, leased, pledged as collateral, occupied, or otherwise controlled), choses in action, books, records, papers and other real or personal property, wherever located, of or managed by Defendant Essex and its subsidiaries and affiliates (collectively, the "Assets"), with full power to sue, foreclose, marshal, collect, receive, and take into possession all such Assets (including access to and taking custody, control, and possession of all such Assets);

7

B.  to assume full control of Defendant Essex by removing, as the Receiver deems necessary or advisable, any director, officer, attorney, independent contractor, employee, or agent of any of Defendant Essex and its subsidiaries and affiliates, including any named Defendant, from control of, management of, or participation in, the affairs of Defendant Essex;

C.  to have control of, and to be added as the sole authorized signatory for, all accounts of the entities in receivership, including all accounts at any bank, title company, escrow agent, financial institution or brokerage firm (including any futures commission merchant) which has possession, custody or control of any Assets, or which maintains accounts over which Defendant Essex, and its subsidiaries and affiliates, and/or any of its employees or agents have signatory authority;

D.  to conduct such investigation and discovery as may be necessary to locate and account for all of the assets of or managed by Defendant Essex and its subsidiaries and affiliates, and to engage and employ attorneys, accountants and other persons to assist in such investigation and discovery;

E.  to take such action as is necessary and appropriate to preserve and take control of and to prevent the dissipation, concealment, or disposition of any Assets;

F.  to choose, engage, and employ attorneys, accountants, appraisers, and other independent contractors and technical specialists, as the Receiver deems advisable or necessary in the performance of duties and responsibilities under the authority granted by this Order;

G.  to make an accounting, as soon as practicable, to this Court and the SEC of the assets and financial condition of Defendant Essex and to file the accounting with the Court and deliver copies thereof to all parties;

**EXHIBIT C**

H.   to make such payments and disbursements from the Assets taken into custody, control, and possession or thereafter received by him or her, and to incur, or authorize the making of, such agreements as may be necessary and advisable in discharging his or her duties as Receiver;

I.   to investigate and, where appropriate, to institute, pursue, and prosecute all claims and causes of action of whatever kind and nature that may now or hereafter exist as a result of the activities of present or past employees or agents of Defendant Essex, and its subsidiaries and affiliates;

J.   to institute, compromise, adjust, appear in, intervene in, or become party to such actions or proceedings in state, federal, or foreign courts, which (i) the Receiver deems necessary and advisable to preserve or recover any Assets, or (ii) the Receiver deems necessary and advisable to carry out the Receiver's mandate under this Order; and

K.   to have access to and monitor all mail, electronic mail, and video phone of the entities in receivership in order to review such mail, electronic mail, and video phone which he or she deems relates to their business and the discharging of his or her duties as Receiver.  The Receiver shall be authorized to review any communications between Defendant Essex and its counsel in this action.  Should a dispute arise over the Receiver's authority to review or disclose any of Defendants' communications with counsel, the Receiver or the parties may petition the Court after making good faith efforts to resolve the dispute.

## XII.

IT IS FURTHER ORDERED that Defendant Essex and its subsidiaries and affiliates, including all of the other entities in receivership, and their officers, agents, servants, employees and attorneys, and any other persons who are in custody, possession or control of any assets, collateral, books, records, papers or other

9

EXHIBIT C

property of or managed by any of the entities in receivership, shall forthwith give access to and control of such property to the Receiver.

## XIII.

IT IS FURTHER ORDERED that no officer, agent, servant, employee or attorney of Defendant Essex shall take any action or purport to take any action, in the name of or on behalf of Defendant Essex without the written consent of the Receiver or order of this Court.

## XIV.

IT IS FURTHER ORDERED that, except by leave of this Court, during the pendency of this receivership, all clients, investors, trust beneficiaries, note holders, creditors, claimants, lessors and all other persons or entities seeking relief of any kind, in law or in equity, from Defendant Iannelli, Defendant Essex, or its subsidiaries or affiliates, and all persons acting on behalf of any such investor, trust beneficiary, note holder, creditor, claimant, lessor, consultant group or other person, including sheriffs, marshals, servants, agents, employees and attorneys, are hereby restrained and enjoined from, directly or indirectly, with respect to these persons and entities:

A. commencing, prosecuting, continuing or enforcing any suit or proceeding (other than the present action by the SEC or any other action by the government) against any of them;

B. using self-help or executing or issuing or causing the execution or issuance of any court attachment, subpoena, replevin, execution or other process for the purpose of impounding or taking possession of or interfering with or creating or enforcing a lien upon any property or property interests owned by or in the possession of Defendant Iannelli or Defendant Essex; and

C. doing any act or thing whatsoever to interfere with taking control, possession or management by the Receiver appointed hereunder of the

property and assets owned, controlled or managed by or in the possession of Defendant Iannelli or Defendant Essex, or in any way to interfere with or harass the Receiver or his or her attorneys, accountants, employees, or agents or to interfere in any manner with the discharge of the Receiver's duties and responsibilities hereunder.

### XV.

IT IS FURTHER ORDERED that Defendant Essex, and its subsidiaries, affiliates, officers, agents, servants, employees and attorneys, shall cooperate with and assist the Receiver and shall take no action, directly or indirectly, to hinder, obstruct, or otherwise interfere with the Receiver or his or her attorneys, accountants, employees or agents, in the conduct of the Receiver's duties or to interfere in any manner, directly or indirectly, with the custody, possession, management, or control by the Receiver of the funds, assets, collateral, premises, and choses in action described above.

### XVI.

IT IS FURTHER ORDERED that Defendant Essex, and its subsidiaries and affiliates, shall pay the costs, fees and expenses of the Receiver incurred in connection with the performance of his or her duties described in this Order, including the costs and expenses of those persons who may be engaged or employed by the Receiver to assist him or her in carrying out his or her duties and obligations. All applications for costs, fees, and expenses for services rendered in connection with the receivership other than routine and necessary business expenses in conducting the receivership, such as salaries, rent, and any and all other reasonable operating expenses, shall be made by application setting forth in reasonable detail the nature of the services and shall be heard by the Court.

### XVII.

IT IS FURTHER ORDERED that no bond shall be required in connection with the appointment of the Receiver.  Except for an act of gross negligence, the Receiver

**EXHIBIT C**

shall not be liable for any loss or damage incurred by any of the defendants, their officers, agents, servants, employees and attorneys or any other person, by reason of any act performed or omitted to be performed by the Receiver in connection with the discharge of his or her duties and responsibilities.

### XVIII.

IT IS FURTHER ORDERED that representatives of the SEC is authorized to have continuing access to inspect or copy any or all of the corporate books and records and other documents of Defendant Essex, and the other entities in receivership, and continuing access to inspect their funds, property, assets and collateral, wherever located.

### XIX.

IT IS FURTHER ORDERED that this Court shall retain jurisdiction over this action for the purpose of implementing and carrying out the terms of all orders and decrees which may be entered herein and to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

IT IS SO ORDERED.

Dated: _____, 2018

_____
UNITED STATES DISTRICT JUDGE

# EXHIBIT D

Letter in Support of Receivership

from Investor Representative

Michael Present, Counsel for

Granger Management LLC

EXHIBIT D

# Vaslas Lepowsky Hauss & Danke LLP
Attorneys at Law
630 Third Avenue, 5th Floor
New York, New York 10017

Staten Island Office
201 Edward Curry Avenue
Staten Island, New York 10314
Tel: (718) 761-9300

Telephone (212) 779-3207
Facsimile (212) 208-3045

New Jersey Office
10 E. Auer Avenue
E.Brunswick, NJ 08816
Tel: (732) 613-5083

Michael Present
e-mail: mpresent@vlhd-law.com
Direct line: 212-779-3207

November 29, 2018

Via E-Mail

Geoff Winkler, JD, MBA, CFE
Managing Director
Alvarez & Marsal Disputes and Investigations, LLC
425 Market Street, 18th Floor, San Francisco, CA 94105

Re: SEC v. Iannelli v. Essex Capital Corporation
Case No. 2:18-cv-05008

Dear Mr. Winkler:

I have reviewed the form of court order (the "Order") prepared by SEC counsel, for the continuation of the preliminary injunction, your appointment as permanent Receiver and the freeze of assets of defendants Ralph Iannelli and Essex Capital Corporation.

This letter shall serve to confirm that my client, Granger Management LLC, believes that the proposed Order is in the best interests of the creditors and as such supports your appointment as permanent equitable Receiver over the assets of Essex Capital Corporation.

Thank you for your attention to this matter.

Very truly yours,

Michael Present

# EXHIBIT E

Letter in Support of Receivership

from Investor Representative

Greg Van Wyk,

Founder and Manager of

Daniel Investment Associates, LLC

EXHIBIT E



# DANIEL INVESTMENT ASSOCIATES, LLC

11/28/18

Alvarez & Marsal Disputes and Investigations, LLC
425 Market Street, 18th Floor, San Francisco, CA 94105

Re: Essex Capital

To Whom it May Concern,

Nineteen of our clients have investments with Essex Capital, eighteen support the appointment of a receiver to the company. Additionally, we support Mr. Geoff Winkler and his firm for the role of receiver.

Sincerely,

Greg Van Wyk

Founder & Manager, DIA

TEL 805.845.7724
FAX 805.845.2840

923 SAINT VINCENT AVE., SUITE B
SANTA BARBARA, CALIFORNIA 93101

WWW.DANIELINVESTMENTASSOCIATES.COM